THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CEDRIC NICKS, Defendant-Appellant.

(No. 12046;

Fourth District—November 21, 1974.

John F. McNichols and J. Daniel Stewart, both of State Appellate Defender's Office, of Springfield, for appellant.

Basil G. Greanias, State's Attorney, of Decatur (Jerry Finney, Senior Law Student, of counsel), for the People.

Mr. JUSTICE SIMKINS delivered the opinion of the court:

Defendant, Cedric Nicks, appeals from three judgments entered on three jury verdicts finding him guilty of three counts of armed robbery and from a sentence imposed of 10 to 30 years to be served consecutively to a prior armed robbery sentence. Defendant raises the following issues: (1) Whether the trial court abused its discretion in not ordering a competency hearing, (2) Whether defendant was proven guilty beyond a reasonable doubt, (3) Whether the trial judge erred in implying that defendant had been charged with prior criminal offenses, (4) Whether only one judgment should have been entered because the three counts

of armed robbery arose from a single transaction, and (5) Whether the sentence is excessive.

On April 7, 1972, defendant appeared *pro se* for arraignment after being charged by information with the February 12, 1972, robbery of Rudow's Market in Decatur, Illinois. On April 13, 1972, defendant appeared without counsel and told the court that he had dismissed his counsel. Defendant promised to obtain other counsel. On April 17, 1972, defendant again appeared *pro se* and told the court that he did not try to obtain counsel. Defendant did not respond to further questioning. The court then appointed the public defender to represent defendant. On June 12, 1972, Alan Bennett, the Macon County public defender, moved to withdraw as counsel for defendant stating that he had previously represented defendant in another case, that defendant would not cooperate or give the information or assistance needed in the defense of that case, that defendant's family has complete control over litigational decisions made by defendant, and that defendant has told him that he no longer wanted his representation. After a hearing the court granted Mr. Bennett's motion to withdraw as counsel. On June 30, 1972, defendant once again appeared *pro se* and refused to respond to questions regarding representation. The court then appointed new counsel.

At the trial, Douglas Whitfill, the manager of Rudow's Market, testified that on the evening of February 12, 1972, a man walked into the store, pushed a sack through his office window, pointed a gun at him, and stated, "This is a hold-up, give me all your money." He then proceeded to put the money into the sack. After handing the robber the sack, he left the office and walked with the robber to the check-out counters where the robber asked the two checkers for their money, put it in his sack, and ran out of the store. He further stated that the robber was in the store approximately 5 minutes and described him as black, having a goatee, weighing about 150 pounds, being about 5'8", and wearing a beret, sun glasses, and a green jacket. He stated that two weeks after the robbery he viewed a line-up and identified defendant as the robber. On cross-examination he stated that he identified defendant on the basis of size, and that he could not positively identify defendant as the robber.

Paula Percival testified that on the evening in question she was working check-out at the market when she saw a man behind her with a gun. She stated that the robber told her to give him the money which she proceeded to do. She stated that defendant was carrying a bag and described the robber in a fashion similar to that given by Whitfill, adding that the beret was green and the robber was wearing green pants. She further stated that several weeks after the robbery she viewed a lineup and

identified defendant as the robber. On cross-examination she stated that she identified defendant because he looked similar to the robber (although he no longer had a goatee), was the same size and was black. She stated that other than that she could not identify defendant as the robber.

Paul Layton testified that on the evening in question he was working in the store and saw a man standing between the two check-out counters. He proceeded to describe the robber in a fashion similar to that given by Whitfill and Percival. He further stated that several weeks after the robbery he viewed a line-up and identified defendant as the robber mainly on the basis of height and color.

Joe Nathan Davis, defendant's half-brother, was called by the State and testified that on the evening in question defendant asked Debbie Schwenker to take him to see a girl friend in her car. Debbie and he proceeded to take defendant, but the girl wasn't home. He stated that they drove defendant over by Hess Park near Broadway to see another woman, but he didn't see where defendant went. He further stated that while defendant was gone, he and Debbie waited in the car and talked. He stated that after a while defendant returned with a bag, the same bag he had when he left home. He stated that he wasn't certain what was in the bag, and that there was no conversation between the three upon defendant's return. The three then drove to the Marilyn McKenna residence. He stated that while there defendant lent him approximately $100, along with another $100 the next evening. This money was divided between Debbie and himself. He stated that the following day defendant, Marilyn, Debbie and he went shopping in Springfield. After this witness was excused the record reads as follows:

"(At this point the defendant violently overturns counsel table. Defendant starts shouting at prosecutor and jury such words as "Shoot me" and "I'll kill you." A black woman from spectator section comes rushing up to defendant and starts addressing the jury panel. Defendant and woman began praying, getting on knees at counsel table, loudly sobbing and yelling. Court bailiffs and personnel attempt to restrain.)

The Court: Just a moment. Will you take her out of the courtroom. We will have no such demonstration at any time. Take her out of the courtroom. She is excluded from the courtroom. For right now leave her here until we have—leave her here, and she will be quiet or she will be removed. Now you hear that? We will have no such demonstration at any time. This court will absolutely not tolerate that. Now you know better than that. You've had experience * * *."

The next day the court stated in reference to the disturbance:

"The Court: * * * There was quite a disturbance in the court-room with a table being up-ended, defendant on his feet yelling and pointing, a woman in the courtroom coming up and addressing the jury about 'the defendant has brain damage.' Also had to be forcibly removed from within the bar * * *"

The woman was identified as defendant's mother:

"The Court: She came through the gate up by the jury stand yelling and crying 'he's got brain damage' and started to use prayers and what not and it was with some difficulty that we got her back to the audience side * * * The record I'm sure doesn't show that she started yelling, talking, and getting down on her knees around the counsel table * * *"

Debbie Schwenker testified that on the evening in question defendant asked her and Davis to take him somewhere. They then drove in front of a house off Main where defendant left the car and returned 10 minutes later. They then took defendant to visit a lady and parked near Garfield Street on Central Avenue. She stated that where they parked was about two or four blocks from Rudow's Market. She stated that defendant then got out of the car, told them to wait, returned a half-hour later, ducked down on the floor and in a very loud voice said "Go." They then drove to Marilyn McKenna's house without any conversation. She stated that Davis and defendant went into the house first, and when she finally entered she went into the bedroom and "there was some money on the bed and Cedric and Marilyn was standing, counting the money." She stated that she received money from Davis on that evening and the next, at which time defendant, Davis, McKenna and she went shopping in Springfield. She further testified that on the evening in question defendant was wearing a green army jacket and a beret style canvas colored hat. She also stated that she had seen defendant with a goatee but couldn't recall when.

At the close of the State's evidence, the defense stated that it had no evidence to offer and rested. The jury then returned a verdict of guilty on all three counts for the armed robbery of Douglas Whitfill, Pam Stogsdill, and Paula Percival and judgment was entered on all three verdicts. After the hearing in aggravation and mitigation the court stated that only one sentence for armed robbery should be given because the three judgments arose out of the same occurrence. The court then imposed a 10- to 30-year sentence for the armed robbery to run consecutively to a previous armed robbery sentence.

Defendant first contends that the trial court abused its discretion in not ordering a competency hearing. Section 104—1 of the Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, par. 104—1) states:

"For the purpose of this Article, 'incompetent' means a person

charged with an offense who is unable because of a mental condition:

(a) To understand the nature and purpose of the proceeding against him; or

(b) To assist in his defense * * *"

The statute goes on to state that if at any time during the course of the trial and before the pronouncement of sentence the court has "reason to believe" that defendant is incompetent to stand trial, the court shall conduct a competency hearing. The "reason to believe" standard has now been replaced by a "bona fide doubt" standard under the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—2—1). (See also *People v. Bender*, 27 Ill.2d 173, 188 N.E.2d 682.) Defendant cites various instances during the course of the trial which, if it is contended, should have given the court "reason to believe" defendant was incompetent or which should have raised a "bona fide doubt" of defendant's competency. First, the pretrial colloquies between defendant and the court concerning securing representation and defendant's refusal to respond to further questioning in that regard. Secondly, reference is made to Public Defender Bennett's motion to withdraw as counsel for defendant citing defendant's refusal to cooperate and the fact that the defense presented no evidence in defendant's behalf either at the trial or the hearing in aggravation and mitigation. Finally, reference is made to an incident in which defendant overturned the counsel's table and shouted at the prosecutor and jury "Shoot me" and "I'll kill you." Defendant's mother then came running from the spectator section yelling "the defendant has brain damage," and defendant and his mother then began praying and loudly sobbing and yelling.

■■ Whether or not to hold a competency hearing lies within the sound discretion of the trial court. (*People v. Pridgen,* 37 Ill.2d 295, 226 N.E.2d 598.) In *Pridgen* defendant's counsel stated to the trial judge that defendant was unable to remember anything about the crime, could not cooperate, and specifically requested the court to impanel a jury to determine competency. Defendant stated that he was suffering from amnesia and could not cooperate in the preparation of his defense. The court then received a behavior clinic report which stated that defendant could cooperate and knew the nature of the charge. In fact, defendant had undergone an operation for removal of a bullet from his brain. The trial judge, however, refused a sanity hearing and was affirmed.

■■ The instant case is not nearly as compelling as the factual situation in *Pridgen.* Here no question was raised by anyone regarding defendant's competency. Furthermore, although defendant certainly displays a belligerent attitude and a contempt for the processes of the court, there is

nothing in the record to indicate that because of a mental condition defendant could not understand the nature of the proceedings or could not assist in his own defense. Nevertheless, the trial judge who had observed defendant throughout the pre-trial and trial proceedings is in a better position to make this decision than is this court, and a reading of the whole record does not indicate that this discretion was abused.

■■ It is next contended that defendant was not convicted of the offense of armed robbery beyond a reasonable doubt. We do not agree. Defendant relies primarily upon the uncertainty of the identification testimony. Obviously, the line-up identification testimony was, indeed, highly equivocable and uncertain. Nevertheless, there is clearly enough evidence to sustain defendant's conviction. Joe Nathan Davis testified that he and Debbie Schwenker drove defendant to a place near the scene of the crime on the evening in question. He also stated that defendant had a bag with him when he left the car and returned with the bag. The store employees testified that the robber placed the stolen money into a bag. He also testified to receiving various sums of money from defendant shortly thereafter and to going shopping with defendant the next day. Debbie Schwenker testified that on the evening in question she drove defendant to within two or four blocks of the market at which time defendant left the car. She further testified that upon his return defendant ducked down on the floor and yelled "go" in a loud voice. She also stated that she then drove defendant to the McKenna residence and later saw defendant counting money in the bedroom. She also admitted receiving money from Davis shortly thereafter and shopping with defendant in Springfield the next day. She stated that on the evening in question defendant was wearing a green army jacket and beret (and had worn a goatee in the past). The testimony of the three store employees established that the robber was wearing a green jacket and beret. On the basis of the record before us there is clearly no reason to disturb defendant's conviction.

■■ At the end of the first day of the trial defendant suddenly overturned the counsel table and began shouting at the prosecutor and jury. Defendant's mother then rushed in from the spectator section yelling and praying. After the disturbance the court admonished defendant's mother to refrain from such activity in the future and "* * * This court will absolutely not tolerate that. Now you know better than that. You've had experience." It is contended that these statements by the trial judge prejudiced defendant because it implied that he had been charged with prior criminal offenses. We first note that defense counsel did not object to the statements either when made or in the post-trial motion. Secondly, the statement was directed to defendant's mother, not to defendant. Thirdly, the jury did not know that the black woman was de-

fendant's mother. Fourthly, the trial judge, immediately after the incident, instructed the jury to disregard the entire incident. Defendant was clearly not prejudiced by such statements, nor was he denied a fair trial because of them.

■■ Although the trial judge imposed only one sentence, judgments were entered on jury verdicts finding defendant guilty on all three counts of armed robbery. Nevertheless, the three counts clearly arose out of the same course of conduct or transaction. Even the trial judge before imposing sentence stated that the three counts arose from a single occurrence. Furthermore, it cannot be said that the three acts were independently motivated. All three acts occurred almost simultaneously, and in each instance it was store money either from a safe or cash register which was taken.

In *People v. Leggett*, 2 Ill.App.3d 962, 275 N.E.2d 651, the court stated that the conviction for the lesser of crimes arising from the same conduct necessitates a reversal of the conviction for that lesser crime provided, of course, that the conviction and sentence imposed on the greater 'crime is sustained. Although *Leggett* involved different crimes arising from the same conduct its rationale is equally applicable to the instant situation where three judgments of the same crime arise from a single transaction. Although the trial judge was correct in imposing only one sentence, he erred in entering judgments on all three counts of armed robbery. Accordingly, the judgment entered on the jury verdict finding defendant guilty of the armed robbery of Douglas Whitfill and Rudow's Market is hereby affirmed, but the judgments entered on jury verdicts finding defendant guilty of the armed robbery of Paula Percival and Pam Stogsdill are reversed.

Defendant also contends that the 10- to 30-year sentence imposed upon him was excessive because it was made to run consecutive to a recent armed robbery conviction and sentence. The record, however, does not indicate that the trial judge abused his discretion in imposing a consecutive sentence. Section 5—8—4(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—4(b)) states, "The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court may set forth in the record."

■■ The present record indicates that the trial judge followed the statutory guidelines. The court stated on the record that it was concerned with the nature and circumstances of this particular offense where a gun was used, innocent persons were confronted, property was taken by.

force, and where a person's life could easily be taken. The court obviously considered the history and character of the defendant and commented on defendant's long history of being at odds with society. The record indicates that defendant was declared delinquent in 1956 and has had parole violations and at least four felony convictions, three for armed robbery, since then. This prior conduct alone is sufficient to support a consecutive sentence especially in light of further statements of the trial court concerning the necessity of protecting the public. In view of the record before us, we do not believe that we should exercise our power under Supreme Court Rule 615 (Ill. Rev. Stat. 1973, ch. 110A par. 615) to reduce defendant's sentence to a concurrent term.

Accordingly, for the reasons stated above, the judgment entered upon the conviction of defendant for the armed robbery of Douglas Whitfill and Rudow's Market and the consecutive sentence imposed thereon should be affirmed. The judgment entered upon defendant's conviction for the armed robbery of Paula Percival and Pam Stogsdill should be reversed.

Affirmed in part, reversed in part.

SMITH, P. J., and CRAVEN, J., concur.