THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JACK MORTHOLE, Defendant-Appellant.

Fifth District   No. 75-211

Opinion filed July 28, 1977.

G. J. MORAN, J., dissenting.

Michael L. Pritzker, Marvin Jay Glass, and David M. Schneider, all of Pritzker and Glass, Ltd., of Chicago, for appellant.

Robert H. Howerton, State's Attorney, of Marion (Bruce D. Irish and Raymond F. Buckley, Jr., both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE EBERSPACHER delivered the opinion of the court:

Defendant, Jack Morthole, was found guilty following a jury trial in the circuit court of Williamson County of the following offenses: unlawful possession of more than 30 grams but less than 500 grams of cannabis; unlawful possession of less than 30 grams of a substance containing heroin; unlawful possession of less than 200 grams of a substance containing amphetamine; unlawful possession of less than 200 grams of a substance containing a derivative of barbituric acid. The court sentenced defendant to one to three years for the first offense and two to ten years for each of the remaining offenses, the terms of all of the sentences to run concurrently.

On appeal defendant presents three issues for review: (1) whether the trial court's denial of his request for a hearing on his fitness to stand trial violated his right to due process of law; (2) whether he received a fair trial; (3) whether the court imposed an excessive sentence.

Following his indictment for the offense of unlawful delivery of a controlled substance and pursuant to a bench warrant, defendant was arrested by Special Agent William Cornwell of the Illinois Bureau of Investigation on May 3, 1973. At the time of his arrest defendant was sitting in a car parked next to a trailer in a mobile home park. After Cornwell advised defendant of his rights the agent noticed a paper sack on the back seat of the car. It was daylight at the time and the car door was open. When Cornwell asked the defendant what was in the sack, defendant replied, "Marijuana." When Cornwell removed the sack, he observed a crushed, green, tobacco-like substance inside. Cornwell then searched the rest of the car and found two knapsacks, inside of which were a band-aid box containing what appeared to be illegal drugs, a wooden kitchen match box containing suspect substances, a plastic vial containing a brownish powdery substance, and four envelopes each containing $500 in cash. Cornwell also discovered a .22-caliber pistol and a number of bullets in the front seat passenger area of the car. Laboratory tests performed on the discovered substances revealed the presence of the following: 341.81 grams of cannabis, 13.20 grams of a substance containing a derivative of barbituric acid, 25.02 grams of substance containing methamphetamine, 26.89 grams of tablets containing phenobarbital and methamphetamine, and .58 grams of a substance containing heroin. As a result of the seizure and the analysis of these items defendant was indicted on September 10, 1973, for the offenses of (1) unlawful possession of more than 30 grams but less than 500 grams of cannabis; (2) unlawful possession of more than 30 grams of a substance containing heroin; (3) unlawful possession of less than 200 grams of a substance containing amphetamine; (4) unlawful possession of less than 200 grams of a substance containing a derivative of barbituric acid; and (5) knowingly carrying a pistol concealed on his person when not on his own land, or in his abode or fixed place of business.

After a number of delays the case was finally set for trial on March 17, 1975, more than 22 months after the initial arrest. Five days prior to the trial date, defendant called Dr. Marvin Pitluk, a psychologist whom he had seen in 1972, and requested immediate help. Dr. Pitluk saw defendant in Chicago at approximately 10 p.m. that evening. After talking with the accused, Dr. Pitluk drove him to Northeast Community Hospital in Chicago where at the psychologist's suggestion, defendant committed himself to the locked psychiatric ward under the care of Dr. Jeffrey Tilkin, a psychiatrist whom Dr. Pitluk had previously contacted

regarding defendant's condition. The next evening Dr. Pitluk called defendant's attorney at home and advised him of defendant's condition and whereabouts.

On March 17, 1975, counsel for defendant appeared and advised the court that defendant was in a psychiatric ward of Northeast Community Hospital. Defendant had been interviewed, but his attorney had been unable to obtain his cooperation. Defendant's counsel then presented a motion raising the question of the fitness of defendant to stand trial and requested the court to continue the matter until this question could be resolved. In support of the motion defendant's counsel presented a letter signed by Dr. Pitluk and Dr. Tilkin. In response the Assistant State's Attorney advised the court that he had called the hospital and confirmed defendant's whereabouts. The trial court denied defense counsel's motion for a continuance and issued a bench warrant for defendant.

The next day, March 18, 1975, defendant appeared with counsel who presented a written motion for a hearing to determine defendant's fitness to stand trial. In support of the motion defendant offered the above-mentioned letter and oral testimony of Dr. Pitluk. Pitluk testified to the events of March 13, 1975, including defendant's commitment to the psychiatric ward of the hospital in Chicago. The psychologist also explained his first contact with defendant in June of 1972. At that time he gave the defendant an extensive battery of psychological tests over the period of several days. In his opinion the tests showed that defendant was then severely depressed, possibly psychotic and in need of medical testing to determine whether he was suffering from organic brain damage and psychosis. Between June 1972 and March 1975 the psychologist had only one other contact with the defendant; he received an inquiry from Southern Illinois University regarding the accused's request for readmission. In response, he wrote a letter recommending that it might be beneficial to permit defendant the opportunity to develop whatever intellectual skills he might possess.

Dr. Pitluk reported that defendant's appearance had degenerated greatly since he had last seen him in June 1972. In the psychologist's opinion defendant was mentally confused and was uncertain why he was even in Chicago. Pitluk explained that the defendant was quite confused in his feelings about a girlfriend who lived in Chicago. Defendant had been taking amphetamines extensively and wanted help because he felt he might eventually kill himself. Dr. Pitluk testified that based on his prior testing, his discussions with the defendant the previous week and his observations, it was his opinion that defendant was presently unable to aid in his own defense because of his mental confusion, self-preoccupation, severe depression, and degeneration from a long use of amphetamines.

On cross-examination, the psychologist stated that it might have been defendant's attorney who referred the accused to him in 1972. Pitluk also stated, however, that defense counsel had not sent defendant to his office on March 12, and that defendant's reason for coming was to seek the psychologist's help in dealing with his feelings towards his girlfriend in Chicago.

The State called Deputy Sheriff William Henshaw and an assistant bailiff, John Rosenburger, the officials who had executed the bench warrant issued the previous day. Deputy Sheriff Henshaw testified that he had had three conversations with defendant, each of short duration, on the way from Chicago to Marion, Illinois. In the first conversation the officer asked defendant questions regarding his admission to the hospital. In the second, he asked defendant if he had eaten at the hospital. Defendant responded that he had and was not hungry and made a vague reference to a hunger strike. The third conversation occurred during booking when defendant responded to questions concerning his name, address, and other information. Defendant also identified two pictures in his possession as pictures of a girlfriend. Assistant Bailiff Rosenburger testified regarding his conversation with the defendant during which defendant had asked him for a cigarette.

The court denied defendant's motion for hearing to determine his fitness to stand trial, as well as defense counsel's request for appointment of an independent psychiatrist to examine defendant. Trial was scheduled for the following day.

On March 19, 1975, the defense again renewed its motion for a fitness hearing. These motions were again denied. Throughout the proceedings of March 19, 1975, which included argument and testimony regarding several other defense motions, defendant continually interrupted the proceedings, sometimes directing foul language at the court. At one point, when the defendant's remarks became particularly vulgar, defense counsel requested five minutes recess to calm his client down. These remarks continued during voir dire. On one occasion defendant lay down on the counsel table and on another he declared that the Lord was his attorney.

On March 20, 1975, out of the presence of the jury, defense counsel moved for a mistrial on the ground that defendant did not understand the proceedings. When the court denied this motion defense counsel renewed his petition for a fitness hearing, whereupon the court called Deputy Sheriff Norman McDonald and Bailiff Rosenburger, who testified that defendant had been cooperative in dressing himself for trial. Defendant's attorney reiterated that defendant had been completely uncooperative. The court again denied defendant's petition for a fitness hearing.

After concluding the proceedings in chambers the judge and counsel

prepared to return to open court. Defendant refused to leave the chambers and had to be carried and pushed down the hallway by the bailiff and the deputy sheriff to the court room. When the three reached the entrance to the court room, the bailiff had to release defendant because the entranceway was too narrow to accommodate two people at once. According to Deputy Sheriff McDonald's testimony, defendant then let his knees buckle and purposely fell, hitting his head on the jury box. When the judge and the attorneys returned to the court room, defendant lay sprawled on the floor, unconscious.

When ammonia did not revive the accused, the court agreed to recess until defendant could be examined at a hospital. Subsequently, the court with both counsel went to the office of Dr. Ko, the doctor who had examined defendant in the emergency room of the hospital for the purpose of determining if defendant was physically able to proceed with the trial. Dr. Ko, in answer to questions by the court, stated that when he first examined the defendant, defendant was lying on a stretcher, still apparently unconscious. The doctor had administered a battery of physical tests which revealed no abnormality. After a "short period of examination" the doctor had concluded that defendant maybe had "acute depression reaction and a history of drug abuse and a slight laceration of the right lower lip area." Dr. Ko would not give an opinion whether defendant was physically able to proceed with the trial. While he found no evidence of a concussion, Dr. Ko refused to rule out that possibility because he did not know defendant's medical history. The doctor also refused to rule out the possibility that defendant was faking an acute depressive reaction.

The defense again renewed its motion for a fitness hearing and again the motion was denied. Defense counsel then moved for a mistrial based on the prejudicial effect of defendant's being carried into the court room, being allowed to fall down, being subsequently placed in a chair, and being carried out of the court room. The court likewise denied this motion.

■■ Before trial commenced the court granted the State's motion to dismiss count V of the indictment, which charged the offense of unlawful use of weapons. The cause proceeded to trial and the State presented evidence as hereinbefore summarized. At the close of the State's case, defendant moved for a directed verdict and specifically moved for a directed verdict regarding count II of the indictment, charging possession of over 30 grams of a substance containing heroin on the ground that the evidence showed that the heroin only weighed .58 grams. The defense also renewed its motion for a hearing on the accused's fitness to stand trial. The court denied all these motions. The defendant presented no evidence and the case went to the jury.

Defendant contends that the trial court's denial of a hearing on his fitness to stand trial violated his constitutional right to due process of law. In particular, defendant argues that the following evidence raised a bona fide doubt regarding his fitness to stand trial, thus entitling him to a full fitness hearing: (1) defendant's hospitalization in a psychiatric ward immediately prior to trial; (2) the testimony of a psychologist that defendant was not capable of aiding in his own defense; (3) a letter from a treating psychiatrist stating that defendant was emotionally incapable of participating in his trial; (4) representations by defense counsel that defendant was unable to cooperate in aiding his defense; (5) the testimony of the examining physician that defendant's acute depression would interfere with his ability to follow the proceedings; (6) defendant's abnormal behavior before the court.

Section 5—2—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—1) defines fitness to stand trial or to be sentenced and establishes procedures to determine it. This section provides in pertinent part:

"(a) For the purposes of this Section a defendant is unfit to stand trial or be sentenced if, because of a mental or physical condition, he is unable:

(1) to understand the nature and purpose of the proceedings against him; or

(2) to assist in his defense.

(b) The question of the defendant's fitness may be raised before trial or during trial. The question of the defendant's fitness to be sentenced may be raised after judgment but before sentence. In either case the question of fitness may be raised by the State, the defendant or the court.

(c) When a bona fide doubt of the defendant's fitness to stand trial or be sentenced is raised, the court shall order that a determination of that question be made before further proceedings.

(d) When the question of the defendant's fitness to stand trial is raised prior to the commencement of trial, the question shall be determined by the court, or by a jury. The defendant or the State may request a jury or the judge may on his own motion order a jury. When the question is raised after commencement of the trial, the question shall be determined by the court.

\* \* \*

(g) If requested by the State or defendant, the court shall appoint a qualified expert or experts to examine the defendant and testify regarding his fitness. The court shall enter an order on the county board to pay the expert or experts."

The question whether a bona fide doubt exists regarding a defendant's fitness to stand trial lies within the sound discretion of the trial court. (*People v. Carter,* 16 Ill. App. 3d 842, 306 N.E.2d 894.) Whenever it becomes apparent during the proceedings that a bona fide doubt of an accused's fitness exists, it is the court's responsibility to stop the proceedings and determine this question before proceeding further. (*People v. Fontaine,* 28 Ill. App. 3d 450, 328 N.E.2d 685.) But only where the trial court has abused its discretion should the reviewing court overturn the order of the trial court refusing a fitness hearing. (*People v. Carter,* 16 Ill. App. 3d 842, 306 N.E.2d 894.) We have thoroughly reviewed the record and are persuaded that the trial court did not abuse its discretion in refusing defense counsel's motions for a fitness hearing or for failing to order an independent examination of defendant. The trial court was in a superior position to observe defendant's behavior, to weigh the evidence and to assess the credibility of the witnesses.

■■■ Taken as a whole the evidence, in our view, did not raise a bona fide doubt that because of a mental or physical condition, defendant was unable to understand the nature and purpose of the proceedings against him or to assist in his defense. Under the instant circumstances defendant's hospitalization in the psychiatric ward five days before trial did not in itself raise a bona fide doubt concerning his fitness to stand trial. His admission to the hospital was voluntary; his condition was attributable to voluntary consumption of drugs and unresolved feelings about his girlfriend. Defendant found Dr. Pitluk's office, was there an hour early, and cooperated adequately. Although defendant had seen Dr. Pitluk on two occasions in 1972 and had been given a battery of psychological tests, defendant had no history of confinement for mental illness. Lack of a history of mental incompetency has been found to be a compelling factor in supporting the trial court's determination of a lack of bona fide doubt of fitness to stand trial. *People v. Skorusa,* 55 Ill. 2d 577, 304 N.E.2d 630.

■■ In light of the trial court's observations of defendant's behavior, the testimony of the State's witnesses and the unsubstantiated nature of psychologist Pitluk's opinion testimony, the court was justified in discounting the psychologist's opinion that defendant was incapable of aiding in his own defense. Pitluk based his opinion that defendant was unfit to stand trial on three factors: (1) defendant's self-preoccupation caused by a severe depression; (2) defendant's confusion, typified by his confused attitude towards his girlfriend; (3) defendant's admission that he needed help to cure his amphetamine habit. These factors, we believe, showed that while defendant may have possessed a sociopathic personality and suffered from psychological and social disturbances, they of themselves are not sufficient to raise a bona fide doubt fitness to stand

trial. (*People v. Carter,* 16 Ill. App. 3d 842, 306 N.E.2d 894; *People v. Jackson,* 11 Ill. App. 3d 933, 297 N.E.2d 195.) Nor did the confused statements of defendant during trial necessarily raise a bona fide doubt of his fitness. (*People v. Van,* 9 Ill. App. 3d 1027, 293 N.E.2d 660 (abstract).) Moreover, *People v. Gilliam,* 16 Ill. App. 3d 659, 306 N.E.2d 352, holds that only a qualified psychiatrist, not a psychologist, can give a professional opinion regarding the mental ability of a defendant as it relates to his criminal capacity. By analogy, we believe that Dr. Pitluk, a psychologist, was not qualified to render an opinion regarding the ultimate issue of defendant's fitness. The fact that Pitluk's testimony was not objected to on this ground did not compel the court to give much weight to the testimony. Furthermore, we find no evidence in the record that Dr. Tilkin, the supervising psychiatrist who apparently approved defendant's admission to the hospital, either personally observed defendant or treated him. Thus, we reach the conclusion that Dr. Tilkin's and Dr. Pitluk's letter stating their opinion of defendant's fitness to stand trial gives only unsupported conclusions regarding defendant's fitness.

■■ In addition, the statements at trial of defense counsel that defendant could not cooperate with him did not create a bona fide doubt of defendant's fitness to stand trial. (*People v. Slaughter,* 46 Ill. 2d 114, 262 N.E.2d 904.) Likewise, the trial court was justified in finding that the testimony of Dr. Ko, the physician who treated defendant in the emergency room after the defendant had fallen in court, did not raise a bona fide doubt of defendant's fitness. Dr. Ko related that his physical examination of the accused showed nothing abnormal. Contrary to defendant's statements in both his brief and reply brief, the doctor did not diagnose him to be incompetent to stand trial. The record shows that Dr. Ko, who was not a psychiatrist, declined to give a psychiatric opinion regarding defendant's condition. He stated, however, that based on his observations, he could not rule out the possibility of acute depression or the possibility that defendant was faking mental illness. Finally, the conduct of the accused in exhibiting a contemptuous attitude toward the court did not demonstrate his lack of fitness to stand trial. (*People v. Nicks,* 23 Ill. App. 3d 435, 319 N.E.2d 531, *rev'd in part on other grounds,* 62 Ill. 2d 350, 342 N.E.2d 360.) While defendant repeatedly disrupted court room proceedings, directed obscene language at the court, laid down on the counsel table and put his toe in his mouth, the testimony of the State's witnesses established that defendant was cooperative and acted normally while outside the courtroom. Our review of the record indicates that defendant's behavior and statements were the product of his antipathy toward the court and not of his inability to understand the nature of the proceedings. The trial judge was entitled to take into account his personal observation of defendant in determining whether

there existed a bona fide doubt of defendant's fitness to stand trial. The court did not abuse its discretion in characterizing defendant's behavior as an attempt to simulate mental illness. Nor did the trial court abuse its discretion in ruling that the evidence failed to establish a bona fide doubt of defendant's fitness to stand trial.

■■ Defendant contends that he was deprived of a fair trial by the hostility of the trial court displayed both in and out of the presence of the jury and by "callous and indifferent" treatment by the court personnel in the presence of the jury. Illustrative of the hostility of the court are, in defendant's opinion, the court's comments evincing its skepticism at defendant's motions for a continuance and a fitness hearing. Specifically, defendant asserts that the following remarks by the court prejudiced him:

> "* * * Now, we are not going to be shoved around on this particular matter. I think if there was a bona fide doubt as to Mr. Morthole's ability to cooperate with counsel that it could have been raised much earlier because this case has been going on almost three years or two years now and there has been no indication to this Court that there has been a bona fide doubt, which there must be raised a bona fide doubt in the Court's mind that Mr. Morthole is incompetent to stand trial, or unfit under the new statutes to stand trial, and gentlemen, I get the impression that this is nothing but a big stall and always has been."

We do not find that these remarks, which were out of the presence of the jury, were prejudicial toward defendant. Unlike *People v. Zaccagnini,* 29 Ill. 2d 408, 194 N.E.2d 286, a case cited by defendant, the court here neither prodded an uncertain State's witness into identifying the defendant nor accused any defense witness of lying. As pointed out by the State, from a factual standpoint supported by the record, the court was entitled in light of counsel's previous bad faith conduct to view the motion for a full hearing on defendant's fitness as simply a dilatory tactic. From numerous events which cast a long shadow over the good faith of defense counsel, the court might reasonably conclude that the raising of the question of defendant's fitness was "nothing but a big stall."

■■ Defendant next argues that the State improperly cross-examined Dr. Pitluk and without evidentiary basis insinuated collusion between defense attorney and the psychologist.

Our review of the record indicates no such improper insinuations on the part of the State's Attorney. *People v. Nuccio,* 43 Ill. 2d 375, 253 N.E.2d 353, a case cited by defendant in support of this contention, is distinguishable. In *Nuccio,* the State, during cross-examination of defendant and the two main defense witnesses, made unsupported insinuations regarding a general pattern of misconduct on their part. Because of these improper insinuations defendant's conviction was

reversed and the case remanded for a new trial. In the instant case, however, the record does not indicate a similar pattern of unsupported insinuations. Defendant's argument that the trial court was unduly influenced by the purported insinuation of collusion is also unsupported by the record. Furthermore, we note that these contested remarks were, as in the case of the above quoted comments, also made outside the presence of the jury before trial.

■■ Defendant contends that he was prejudiced by the "callous and indifferent" treatment by the court personnel charged with his custody which resulted in his fall inside the courtroom and by the conduct of the trial judge immediately after this incident. In particular, defendant contends that his fall was deliberately caused by the bailiff, and that the remarks of the court, which indicated that defendant was faking, demonstrated the court's hostile attitude toward defendant to the jury.

First of all, the record does not establish that the bailiff purposely allowed defendant to fall and hit his head. Deputy McDonald testified that the narrowness of the entranceway into the courtroom would not permit the bailiff to continue to carry defendant. According to the deputy's testimony, when the bailiff released defendant, he let his knees buckle and, in Deputy McDonald's opinion, he purposely fell.

Secondly, we believe that in view of defendant's prior disruptive behavior, the court's comments upon returning to the courtroom and finding defendant lying unconscious on the floor were, though perhaps unwarranted, understandable under the circumstances. At the first hearing regarding the existence of a bona fide doubt of defendant's fitness to stand trial, defendant attempted to tear up his shoes. During the pretrial proceedings the defendant continually interrupted the court, sometimes directing obscene language at the trial judge, During voir dire defendant laid down on counsel table and on another occasion interrupted the proceedings, stating that the Lord was his attorney. Immediately prior to the incident in question, defendant refused to leave the chambers and the officers were forced to carry him into the courtroom. Upon returning to the courtroom and finding defendant lying on the floor, the court could reasonably assume that this was but another disruptive tactic by defendant.

Defendant misplaces reliance on *People v. Kelly*, 29 Ill. 2d 53, 193 N.E.2d 21, where in the presence of the jury, the court displayed on numerous occasions its impatience and hostility toward defendant and defense counsel. In *Kelly*, the court told defense counsel to sit down or the court would have the bailiff sit him down, accused defense counsel of stalling, and broke his gavel while remonstrating defense counsel. No similar hostility or impatience was evidenced in the instant case. Rather, in several instances the court demonstrated its accommodation to

defendant and his counsel in order to preserve the fairness of the trial. We note that the court agreed to hold a hearing on defendant's motion to suppress evidence despite its lack of timeliness. Secondly, the court permitted defendant to call Thomas Hurst as a witness despite the fact that defense counsel represented that they did not know to what Hurst would testify. Thirdly, the court attempted to answer almost every one of defendant's questions to the court, notwithstanding his disruptive courtroom behavior. Next, when it became apparent that the defendant really was not conscious, the court agreed to recess to determine defendant's condition. When ammonia tablets did not revive defendant, the court agreed to recess until such time as defendant could be treated at a hospital. Lastly, the court called on its own motion Dr. Ko, the physician who treated defendant in the emergency room, to give his opinion regarding defendant's physical fitness to stand trial.

Defendant next points to four alleged instances of improper conduct and overreaching on the part of the State. Defendant initially argues that he was prejudiced by the conduct of the State in charging him with the offense of unlawful use of weapons and with the offense of possession of more than 30 grams of heroin, where the police reports, defendant contends, disclosed a lack of an evidentiary basis for these charges. Defendant also asserts that the very reading of these charges to the prospective jurors during voir dire was prejudicial.

■■ As has been pointed out by the State in its brief, the discovery material relied on by defendant in making the above assertion was the same material defendant attacked as "unintelligible" in his motion for a continuance. With respect to the unlawful use of weapons charge, we find that an evidentiary basis for this offense existed. Agent Cornwell testified he found a .22-caliber pistol under the front seat of defendant's car. The applicable statute makes it a crime to carry any pistol, revolver, or other firearm concealed either on or about one's person or *in any vehicle*. (Ill. Rev. Stat. 1975 Supp., 1976, ch. 38, par. 24—1(a).) (Emphasis added.) That the Assistant State's Attorney at trial chose to dismiss the weapons count prior to the commencement of testimony rather than amend the indictment is hardly indicative of "prosecutorial overreaching" as charged by defendant. In light of the convincing evidence of defendant's guilt of the drug offenses we cannot say that the mere reading of the charge at the commencement of the jury selection process influenced the jury's verdict.

■■ With respect to the count charging possession of more than 30 grams of heroin, we find no prejudice to the defendant. The verdict forms submitted to the jury referred only to the possession of "less than 30 grams of a substance containing heroin." Defendant relies on *People v. Rudder*, 100 Ill. App. 2d 163, 241 N.E.2d 108. In *Rudder* the prejudice to

defendant occurred when the trial court refused to direct a verdict on the clearly inadequate proof of a companion assault charge which, under the circumstances, may have precipitated and influenced the verdict of guilty on the lesser charge of driving while license suspended. Here there was no analogous refusal to direct a verdict on clearly inadequate proof. The proof in the present case clearly showed that defendant possessed .58 grams of a substance containing heroin.

■■ Defendant's second contention regarding alleged prejudicial conduct on the part of the State in presenting testimony concerns Agent Cornwell's testimony about the pistol he found under the front seat of defendant's car. Since defendant never objected to this testimony, he is thus precluded from attacking it as prejudicial for the first time on appeal. (*People v. Skorusa*, 55 Ill. 2d 577, 304 N.E.2d 630; *People v. Fulton*, 84 Ill. App. 2d 280, 228 N.E.2d 203, *cert. denied*, 390 U.S. 953, 19 L. Ed. 2d 1145, 88 S. Ct. 1045.) The second reference to the pistol during presentation of evidence involved the court's sustaining—outside the presence of the jury—defendant's objection to the introduction of the pistol into evidence. Obviously, this second reference to the pistol could not have prejudiced the jury.

The third instance of purportedly prejudicial conduct on the part of the State concerns the State's reference in closing argument to the discovery of the pistol by Agent Cornwell along with the other items. Because the charge concerning the pistol had been dropped and because the pistol had been ruled inadmissible, we find that this brief remark was error, but did not constitute a material factor in defendant's conviction. Accordingly, we would be inclined to find the remark harmless. (*People v. Berry*, 18 Ill. 2d 453, 165 N.E.2d 257, *cert. denied*, 364 U.S. 846, 5 L. Ed. 2d 69, 81 S. Ct. 87.) Since defendant failed to object to the remark at trial, however, we instead deem his attack on the propriety of the remark for the first time on appeal waived. *People v. Skorusa*, 55 Ill. 2d 577, 304 N.E.2d 630.

■■ Fourthly, defendant argues that he was prejudiced by the conduct of the State in presenting testimony relating to other charges. Defendant further complains that the State deliberately emphasized these charges in closing argument. The testimony of Agent Cornwell that his arrest of defendant was pursuant to an outstanding bench warrant charging the accused with unlawful delivery of amphetamines was properly before the jury, since it explained the circumstances surrounding defendant's arrest and was part of a continuing narrative. (*People v. Robinson*, 98 Ill. App. 2d 285, 240 N.E.2d 397.) Reference to the arrest warrant in closing argument was made by the prosecutor to justify the search of defendant's car and was a proper remark. Even if the comments regarding the circumstances of defendant's arrest were not proper, by

failing to object to them defendant has waived the issue he seeks to present. (*People v. Skorusa*, 55 Ill. 2d 577, 304 N.E.2d 630.) For all of the foregoing reasons, we find that defendant received his constitutional right to a fair trial.

Finally, defendant contends that the court imposed excessive sentences.

■■ The standard of review where the sentence imposed is within statutory limits is whether the trial court abused its discretion. (*People v. Taylor*, 33 Ill. 2d 417, 211 N.E.2d 673.) To modify the sentence it must appear to the reviewing court that the punishment clearly departs from fundamental law, its spirit and purpose, and the requirement of our constitution that the sentence be proportionate to the nature of the offense and measure the possibilities for rehabilitation. (*People v. Grau*, 29 Ill. App. 3d 327, 330 N.E.2d 530; *People v. Smith*, 28 Ill. App. 3d 908, 329 N.E.2d 896.) The instant defendant was found guilty of possessing quantities of four kinds of illegal drugs and when arrested, the accused had $2,000 in cash and a gun in his car. The presentence report indicates an attack by defendant upon his girlfriend. Viewing the history and character of the defendant and the nature and seriousness of the present offenses, we cannot say that the trial court abused its sentencing discretion.

Consequently, we affirm the judgment of the circuit court of Williamson County.

Judgment affirmed.

CARTER, P. J., concurs.

Mr. JUSTICE GEORGE J. MORAN, dissenting:

I believe the evidence before the trial court in this case pertaining to defendant's mental incompetence clearly raised a bona fide doubt as to his fitness to stand trial. Accordingly, I think the trial court abused its discretion in refusing to conduct a hearing to determine defendant's fitness.

As the majority has noted, defense counsel made several motions for a fitness hearing during the trial. At one point, after the proceedings in the chambers were concluded, defendant was knocked unconscious by a fall as he returned to the court room. When he could not be revived he was taken to a nearby hospital and treated by Dr. Ko. Later that day the court and counsel questioned Dr. Ko as to the defendant's ability to proceed with the trial. I think the following colloquy is very important:

> "The Court: I mean, could he sit in a chair and listen physically? Dr. Ko: I don't think so.

> The Court: You don't think he can?
>
> Dr. Ko: If it's acute depression * * *.
>
> The Court: I mean physically?
>
> Dr. Ko: In normal conversation I don't think so. It takes time.
>
> The Court: I'm not talking about mentally. Is there any physical reason why he cannot sit in a chair and listen?
>
> Dr. Ko: I very doubt it [sic].
>
> The Court: That he physically cannot sit in a chair?
>
> Dr. Ko: Physically he can sit down but I don't think normal hearing or interpretation or judgment. My impression is that he may, you know, difficulty [sic]."

After this testimony of Dr. Ko, the court again denied defendant's motion for hearing to determine his fitness to stand trial, restating his belief that defendant was faking an acute depressive reaction.

While the totality of the evidence is contrary to the trial court's finding, it may well be that the defendant was in fact faking his apparent mental problems. However, without the fitness hearing with its appointed neutral experts, we are left in the position of merely guessing as to his actual mental state. It seems very likely that the trial judge confused the quantum of evidence necessary to grant a hearing to determine defendant's competency with the ultimate quantum of proof necessary at the hearing. Similarly, we cannot apply the same standard in reviewing a sanity hearing that we use in determining whether the trial court committed error in refusing to grant such a hearing.

If the defendant is required to demonstrate his mental incompetence in his motion for a fitness hearing, then what is the purpose of having the hearing? Would not his preliminary proof have already established his incompetence, thereby eliminating the necessity for further evidence at such a hearing? The illogic of such a conclusion is obvious. I think it is clear that the evidence necessary to require a sanity hearing is far short of that necessary to actually establish mental incompetency. (See *People v. McCullum*, 66 Ill. 2d 306, 362 N.E.2d 307, where the Supreme Court of Illinois declared section 5—2—1(i) of the Unified Code of Corrections (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—1(i)) unconstitutional to the extent that it places the ultimate burden of proving unfitness to stand trial on the defendant.)

Relying on the above distinction, I believe that while there may have been insufficient evidence in the record to indicate that the defendant was mentally unfit to stand trial, there was more than enough evidence to require a sanity hearing to make such a determination.