THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DARREN BOERCKEL, Defendant-Appellant.

Fifth District   No. 77-518

Opinion filed January 10, 1979.

104

G. MORAN, P. J., dissenting.

Jack A. Strellis, of Gomric and Strellis, of Belleville, for appellant.

Kelly D. Long, State's Attorney, of Hillsboro (Bruce D. Irish and Martin N. Ashley, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Following a jury trial in the circuit court of Montgomery County, defendant, Darren Boerckel, was found guilty of the offenses of rape, burglary and aggravated battery. The court thereafter imposed respective terms of imprisonment of 20 to 60, five to 15, and two to six years, to be served concurrently. Defendant appeals.

Of the issues raised on appeal, we shall address the following: whether the trial court erred in admitting defendant's confession; whether the trial court erred in denying the discovery of certain material; whether the evidence was sufficient to support defendant's convictions; whether the sentence was excessive; and whether the court erred in denying a motion to determine defendant's fitness for sentencing.

The instant offenses stem from an incident which took place sometime between 10:30 and 11 p.m. on August 23, 1976, in Litchfield, Illinois. At that time, a young man dislodged a window fan and entered the residence of an 87-year-old woman. Once inside, the man threw the woman onto the floor, and raped her.

The principal evidence against defendant at trial was his written confession, which was admitted over objection, and the testimony of the two law enforcement officers to whom defendant's confession was made.

The written confession consists of three pages. The first page is an Illinois State Police form which purports to be defendant's waiver of certain constitutional rights, commonly referred to as *Miranda* rights. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L Ed. 2d 694, 86 S. Ct. 1602). The final two pages set forth a detailed statement of the circumstances of the offense indicating that the defendant was the rapist. Each page is signed by defendant Boerckel and witnessed by Mt. Olive police officer David Lienard and Illinois State Police detective Larry Huggins.

In the remainder of its case, the State endeavored both to show that the crimes had been committed and to corroborate the defendant's confession.

Medical testimony established that the victim had had forceful sexual intercourse on the evening in question, that she had suffered a slight fracture of a rib and a compression fracture of her left tibia, a leg bone, and that she was not able to bear any weight on her left leg for a period of time after the incident.

The victim's son-in-law, James McCart, testified over objection that he received a telephone call from his mother-in-law between 10:30 and 11 p.m. on August 23, 1976. She was crying and stated to him, "Jim, can you come and get me? Some man broke in my window and raped me." Mr. McCart immediately called the Litchfield police department. He and his wife, Alice, then got dressed and drove to the victim's residence. Both of the McCarts estimated that they arrived at her house within 15 minutes after receiving the telephone call.

Jim and Alice McCart each gave an account of what happened upon their arrival, the main portion of which was a recounting of the statements made by the victim. Testimony as to these statements was allowed on the basis of the excited utterance exception to the hearsay rule.

Mrs. McCart's account was more complete. She indicated that her mother was nervous, upset and crying when they arrived. Mrs. McCart asked her mother if she was hurt, at which time she related what happened. She told them that a man had first come to her bedroom window and awakened her and that he then pushed in a dining room window fan and came in the window. After gaining entry, he grabbed her and threw her on the couch and from there onto the floor where he raped her. During the assault he choked her, and when he had finished he exited by the same window.

Although the victim could not see her attacker, she knew he had long hair because she put up her hands and felt it. She also believed he was a young man. Mrs. McCart further indicated that her mother was wearing a nightgown and no undergarments at the time of the attack.

The details of the defendant's confession were substantially the same as those given by the victim to the McCarts. The record further established that defendant had shoulder-length or longer hair at all relevant times and that he told Detective Huggins while being interrogated that the woman he raped was not wearing any underpants.

The expert testimony of IBI criminalist James Bald was also offered by the State. Mr. Bald testified that 43 percent of all caucasians have type O blood and that type O blood is characterized by the presence of a high level of H substance in the red blood cells. He further testified that 80 percent of the general population are what is known as secretors; that is, their saliva and other bodily solutions will exhibit the substances which are in their red blood cells. Mr. Bald ran tests on a blood sample and a saliva sample from defendant. He was able to determine that defendant has type O blood and is a secretor. Mr. Bald also ran several tests on certain stains found on the victim's nightgown. The initial tests revealed that the stains were human seminal material. He then tested for the presence of the various factors. This test revealed the presence of the H substance only. He was therefore able to conclude that the seminal

material came from a male with type O blood who was a secretor. Mr. Bald estimated that approximately 39 percent of all caucasians are type O secretors.

The defendant presented an alibi defense through the testimony of his grandmother, Cora Buzick. She testified he was home with her at the time of the rape.

Prior to trial, defendant filed a motion to suppress his confession. After an evidentiary hearing, the court denied the motion. In this appeal the defendant asserts the same three grounds for suppression which he raised in that motion, namely, that the confession is a product or "fruit" of an illegal arrest, that he did not knowingly and voluntarily waive his *Miranda* rights and that his confession is the result of coercion and therefore involuntary.

In the suppression hearing, the testimony of Officer David Lienard and Detective Larry Huggins was offered by the State to establish the admissibility of defendant's oral and written confessions. These officers testified concerning the circumstances attending the giving of the confessions both in the suppression hearing and at trial. The following facts may be gathered from their testimony.

Since the Litchfield police had indicated to Detective Huggins that defendant was considered a strong suspect in the rape case, the detective was anxious to talk to him with reference to his investigation. Consequently, on August 31, 1976, Detective Huggins told Officer Lienard to keep a look out for defendant and if he saw him to inquire if he would talk to Huggins. Officer Lienard was not directed to arrest defendant.

At approximately 2:50 p.m. Officer Lienard, while patrolling in Mt. Olive, saw defendant standing on a street corner. The officer pulled his squad car to the curb and told defendant that Detective Huggins wanted to talk to him. The defendant apparently agreed. At any rate, he did not indicate that he did not want to go to the station. According to Lienard, defendant was not under arrest and was free to leave if he wanted to. Officer Lienard then drove defendant to the Mt. Olive police station, which was a block away. Once at the station, Lienard called the State Police headquarters in Litchfield and told the dispatcher to contact Huggins and tell him that defendant was at the Mt. Olive police station. After Officer Lienard had placed the call, the defendant asked if he could return to the corner where he had been originally located in order to tell his girlfriend to go on to work. Thereafter, defendant and Lienard walked to the corner, and Lienard observed defendant tell his girlfriend that he was waiting to talk to Detective Huggins. They then returned and remained in the main office until Detective Huggins arrived at around 3:45 p.m.

Detective Huggins identified himself, informed defendant that he was conducting an investigation into the rape which had occurred in Litchfield and asked defendant if he would be willing to talk to him about the case. The defendant said he would be glad to.

Prior to asking any questions of defendant, Huggins read defendant his *Miranda* rights from a card. Huggins paused after each right and asked defendant if he understood it before going on to the next one. The defendant indicated that he understood them all. The detective further informed defendant that he was not under arrest, that he was free to go when he wanted to and that he could stop talking to him or demand a lawyer at any time.

The defendant initially told Huggins that while walking to a neighborhood gas station on the night in question to purchase a coke, he saw two men on the victim's porch. One of the men was wearing a stocking cap. When he returned from the station they were gone. Defendant then indicated that there was nothing else he could tell Huggins. At this point, Huggins advised defendant that fingerprints had been found on a window fan at the burglarized premises and that he felt they could be defendant's. The defendant then admitted breaking into the house but denied the commission of the rape. Huggins told defendant that medical evidence had established that the victim was raped and that it was not logical that defendant had burglarized the house as described by the victim but had not committed the rape. After several moments of silence, defendant broke down and said, "I did it." He then described the manner in which the offense took place.

Prior to reducing defendant's confession to writing, Huggins re-advised defendant of his *Miranda* rights by reading them to him from the form which comprises page one of the written confession introduced at trial. After reading each right, Huggins paraphrased it into simpler language. The defendant indicated he understood his rights and placed his initials on corresponding lines. Defendant then signed a waiver of rights provision.

Since defendant indicated he did not write very well, Detective Huggins wrote out the statement using same or similar words to those of the defendant. When the two-page confession was completed, Huggins read back each page separately, and the defendant acknowledged both pages as being his statement and placed his signature at the bottom of each one.

According to Huggins, there was no physical evidence linking defendant to the crime before the interrogation. After defendant made his statement, he was no longer free to leave, but he was not formally arrested until sometime later when he was delivered to the Litchfield police station.

The testimony of defendant and his mother, Caroline Boerckel, was offered in support of defendant's motion to suppress. The gist of Mrs. Boerckel's testimony was that defendant's reading skills were very limited.

The defendant testified that he felt that he could not have chosen to leave when confronted by Officer Lienard. Defendant exhibited his reading ability by reading the *Miranda* warnings aloud, omitting the words he did not know. Defendant's recitation was incomprehensible consisting of pronouns, prepositions and simple verbs. Defendant further testified that he signed the three pages of his confession because he was upset about a "lot of things."

On cross-examination, defendant first maintained that he did not make a statement and that he did not see anything written on the paper. He later conceded that he knew when he signed the statement that it said he had raped the victim. He further agreed that no one forced him to sign the statement and that he did so of his own free will.

The linchpin of defendant's argument that his confession is a fruit of an illegal arrest is that he was arrested before he made his confession.

■ An arrest involves the following three elements: authority to arrest; assertion of that authority with intent to effect an arrest; and restraint of the person to be arrested. (*People v. Robbins* (1977), 54 Ill. App. 3d 298, 369 N.E.2d 577; *People v. Ussery* (1974), 24 Ill. App. 3d 864, 321 N.E.2d 718.) With respect to the element of intent to effect an arrest, the intent of the officer and the understanding of the arrestee are both essential. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870; *People v. Ussery*.) However, the understanding of the arrestee is not synonymous with his subjective belief at the time but rather with what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes. *People v. Wipfler.*

■ By denying defendant's motion to suppress, the trial court made an implicit finding that defendant was not under arrest prior to incriminating himself. Such finding was entirely correct. The record does not establish either an act done with the intent to effect an arrest or restraint of the defendant.

Both officers testified that defendant was not under arrest and that he was free to leave at any time prior to confessing. In addition, Detective Huggins specifically told defendant before questioning him that he was not under arrest and that he was free to leave whenever he wanted to. The record before us is devoid of any procedures, acts or utterances of an officer which one normally associates with placing someone under arrest. The evidence, viewed as a whole, does not support a finding that either officer intended to arrest defendant at any time before he confessed or that defendant could have harbored a reasonable and objective belief to

the contrary. This is true despite the fact that Detective Huggins told defendant he believed the fingerprints found at the scene could be defendant's at a time when he had no basis for such belief. Detective Huggins candidly admitted at the suppression hearing that there was no tangible evidence connecting defendant to the crime prior to his interrogation; it is highly unlikely he would have attempted to effect an arrest in view of this fact.

Moreover, we note that although defendant finds it particularly telling with respect to the arrest issue that Officer Lienard accompanied him when he returned to the corner to talk to his girlfriend, the fact that defendant was allowed to leave the station on foot is actually probative of a lack of restraint.

The defendant next raises the question whether he knowingly waived his rights against self-incrimination prior to confessing. While acknowledging that he was advised of his rights and that he signed a waiver with respect to them, defendant asserts that he was not possessed of sufficient intelligence to understand the admonitions and the significance of his signing the waiver. We disagree.

Our supreme court recognized in *People v. Turner* (1973), 56 Ill. 2d 201, 205, 306 N.E.2d 27, 30, that:

> "The purpose of advising an accused of his rights is to enable him to make an intelligent decision, and to understand the consequences of that decision, and the fact that the advice was iterated and reiterated, and that he said he understood it, is of little consequence unless the defendant was possessed of the intelligence to understand the admonition."

However, the court also noted that a defendant's mental deficiency, of itself, does not render a confession involuntary but rather is merely a factor which must be considered in the totality of the circumstances under which one's constitutional rights were waived or a confession made. *People v. Turner* (1973), 56 Ill. 2d 201, 205, 306 N.E.2d 27, 30; see also *People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383; *People v. Hester* (1968), 39 Ill. 2d 489, 237 N.E.2d 466, *cert. dismissed* (1970), 397 U.S. 660, 25 L. Ed. 2d 642, 90 S. Ct. 1408.

■ The only evidence introduced at the suppression hearing concerning defendant's mental abilities was Mrs. Boerckel's testimony that defendant had limited reading skills and that he attended special education classes through 10th grade.

The trial court, giving this evidence due weight, was nevertheless justified in finding that defendant was possessed of sufficient intelligence to understand and knowingly waive his rights. This is true because of the other circumstances of record. Defendant's reading level was not as crucial here as it might have been under other circumstances since the

*Miranda* rights were read to defendant rather than by him and were paraphrased into simpler language before defendant indicated he understood them. We also note that the trial judge was in an unexcelled position to assess defendant's abilities since he was able to view defendant on the stand and observe the demonstration of his reading skills first hand. Moreover, the trial testimony of neuro-psychiatrist John Goldsborough also supports the conclusion that defendant was capable of making an intelligent waiver of rights. Dr. Goldsborough confirmed that defendant was of borderline intelligence, with an IQ of about 70, and that he had a long-standing reading defect; however, he was of the opinion that defendant was able to understand oral communications very well and that he could understand the *Miranda* warnings if given to him verbally.

Defendant's final argument with respect to his confession is that it was not voluntarily made, that it was a product of coercion.

The general rules with regard to voluntariness of confessions were succinctly set forth in *People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731:

"Whether a statement is voluntarily given depends upon the totality of the circumstances. The test is whether it has been made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. [Citation.] In making its decision the trial court need not be convinced beyond a reasonable doubt, and the finding of the trial court that the statement was voluntary will not be disturbed unless it is contrary to the manifest weight of the evidence."

The trial court found that defendant's confession was voluntary. We do not think that this finding was against the manifest weight of the evidence. The defendant asserts in support of his contention of coercion that he was illegally detained and that he was falsely confronted with incriminating evidence. We have already found that defendant was not under arrest or otherwise unlawfully restrained prior to the interrogation. Consequently, if defendant's confession was involuntarily made, defendant's will must have been overborne by the alleged misrepresentation made by Detective Huggins.

The record reveals that Detective Huggins never told defendant that his fingerprints were recovered from the victim's residence. He merely told defendant that some fingerprints had been found and that he believed they could be defendant's. In fact, none of the fingerprints discovered at the scene were identifiable, but this was not known at the time of the interrogation.

Although Huggins, by making this statement, may have misrepresented the evidence against defendant and led him to believe

that his fingerprints had been recovered from the scene of the crime, we find that this deception was neither of a nature likely to produce an untrustworthy confession nor so reprehensible as to be offensive to basic notions of fairness. *People v. Pritchett* (1974), 23 Ill. App. 3d 368, 319 N.E.2d 101 (abstract); *People v. Houston* (1976), 36 Ill. App. 3d 695, 344 N.E.2d 641, *cert. denied* (1977), 429 U.S. 1109, 51 L. Ed. 2d 562, 97 S. Ct. 1143; *People v. Griffith* (1976), 40 Ill. App. 3d 690, 353 N.E.2d 53.

Defendant was thoroughly admonished as to his rights and was not subjected to physical abuse, threats or promises. In view of these circumstances we cannot say that the trial court erred in failing to suppress his confession. *People v. Houston; People v. Pritchett.*

In summary, we have concluded that defendant was not under arrest prior to questioning, that he knowingly and voluntarily waived his *Miranda* rights, and that the confession which followed was voluntarily made and properly admitted into evidence.

The defendant next contends that he was deprived of due process by the court's denial of his request for discovery of "any and all evidence developed on any other individuals that were possible subjects [*sic*] in the alleged crime in the Indictment." He asserts that this material was discoverable under Supreme Court Rule 412(c) (Ill. Rev. Stat. 1975, ch. 110A, par. 412(c)) which provides in part that "the State shall disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged * * *."

The defendant has not directed our attention to any item that was not disclosed as a result of the trial court's ruling that would have tended to negate his guilt. The State indicated in its response to defendant's discovery motion that it was not in possession of any such material. We have no reason to doubt the veracity of that representation. Surely the fact that some other young men in the Litchfield area may have been considered suspects during the preliminary stages of investigation does not indicate that any material developed with respect to them would tend to negate defendant's guilt of these crimes. The trial court did not err in denying discovery as to these materials. "The State is not required to produce a defendant's witnesses or to create his defenses." (*People v. Lighting* (1967), 83 Ill. App. 2d 430, 435, 228 N.E.2d 104, 106.) Moreover, most, if not all, of the information sought by defendant was supplied to him in the form of the investigation report of Litchfield police officer Richard Elledge.

This court declines to consider defendant's contentions that the trial court erred in admitting evidence of blood grouping tests and certain statements alleged to be spontaneous declarations and that he was denied a fair trial as a result of prosecutorial misconduct. We believe that these

issues have been waived as a result of defendant's failure to adequately specify them in his written post-trial motion. *People v. Rogers* (1975), 32 Ill. App. 3d 788, 336 N.E.2d 784; *People v. Marshall* (1977), 50 Ill. App. 3d 615, 365 N.E.2d 1122; *People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 337 N.E.2d 454.

■ Defendant's post-trial motion attempted to incorporate by reference all motions and objections denied or overruled both before and at trial. We believe the following comment of the court in *People v. Rogers* (1975), 32 Ill. App. 3d 788, 790, 336 N.E.2d 784, 785, is equally appropriate here:

> "If such a request truly did preserve all errors, the rationale behind post-trial motions would be destroyed."

The defendant's next contention is that the evidence did not sufficiently corroborate his confession so as to support his conviction for rape. He argues that the only evidence apart from the confession to link him in any way to the crime is the equivocal evidence as to blood grouping.

It is well settled that while a conviction cannot be based on a confession alone, the other evidence in the case need not be sufficient by itself to connect the defendant to the offense. (*People v. Norcutt* (1970), 44 Ill. 2d 256, 255 N.E.2d 442; *People v. Walden* (1976), 43 Ill. App. 3d 744, 357 N.E.2d 232.) It is enough if the other evidence tends to show that a crime did in fact occur or to corroborate the confession. (*People v. Norcutt; People v. Walden.*) We have reviewed the record and conclude that the evidence is sufficient in this respect.

■ The medical evidence and spontaneous statements of the victim to the McCarts established the occurrence of both the rape and aggravated battery offenses. Defendant's confession was corroborated in all material respects by the spontaneous declarations of the victim, indicating that he was in fact the perpetrator of these crimes. In addition, defendant's identity as the offender was also bolstered by the fact that both the rapist and defendant had long hair, type O blood and were secretors. Defendant's confession was further corroborated by the fact that defendant knew the victim was wearing no undergarments at the time of the attack.

The defendant further contends that the sentences imposed in this case are excessive. It is apparently his position that the trial court overlooked his young age and did not give due consideration to his potential for rehabilitation.

■ Sentencing is a matter within the sound discretion of the trial court, and absent an abuse of discretion, a sentence imposed will not be disturbed by a court of review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Under the rationale of *Perruquet*, our function is not to

serve as a sentencing court but only to determine whether the lower court abused its discretion when imposing the sentence.

The record reflects that in imposing these sentences, all of which are greater than the minimum term, the court confined itself to considering the nature and circumstances of the offense and the history and character of defendant as directed by statute. (Ill. Rev. Stat. 1977, ch. 38, par. 1005—8—1(c)(2), (3), (4).) After considering the same criteria, we cannot find that there has been an abuse of discretion in imposing sentences.

First, we agree with the trial court that this is a serious offense. The defendant invaded the home of the 87-year-old victim and raped her in such a violent manner as to break her leg and a rib. Since this assault, the victim has been unable to care for herself. Second, defendant's past history of offenses does not reflect favorably on his potential or willingness to refrain from criminal activity. At the time he committed the instant offenses, he was on parole from a commitment to the juvenile division of the Department of Corrections stemming from two burglary charges. He had been at liberty for only a few months. Prior to these offenses, he had been convicted of illegal possession of alcohol by a minor and disorderly conduct (obscene phone calls). The instant sentences were proper.

Defendant's final contention is that the trial court erred in denying defendant's motion to determine the defendant's fitness for sentencing.

The statutory provision governing fitness to stand trial or to be sentenced provides that a hearing on the question need only be conducted when a *bona fide* doubt of the defendant's fitness is raised. (Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1(c).) The question whether a *bona fide* doubt regarding a defendant's fitness exists lies within the sound discretion of the trial court, and an order of the trial court refusing a fitness hearing will be overturned only where the court has abused its discretion. *People v. Morthole* (1977), 51 Ill. App. 3d 919, 366 N.E.2d 606; *People v. Carter* (1974), 16 Ill. App. 3d 842, 306 N.E.2d 894.

■■ We find that the trial court did not abuse its discretion in refusing a presentencing fitness hearing. Defense counsel did not present any evidence relevant to defendant's fitness in his motion or in argument that had not already been considered by the court. Although defendant is of low intelligence, there is nothing in the record to contradict Dr. Goldsborough's pretrial finding that defendant was fit to stand trial.

For the foregoing reasons, we affirm the judgment of the circuit court of Montgomery County.

Affirmed.

KARNS, J., concurs.

Mr. PRESIDING JUSTICE GEORGE J. MORAN, dissenting:

Defendant, a 17-year-old educable mentally handicapped young man, was standing on the corner of Main and Poplar Streets in Mount Olive, Illinois, waiting to meet a girl friend when he was picked up by Officer David Lienard of the Mount Olive Police Department and taken to the Mount Olive police station. This was done at the request of Larry Huggins, an Illinois State police officer who later took a statement from the defendant in which defendant admitted committing the crime in question.

Huggins testified that he told the defendant that he was conducting an investigation and asked defendant if he would care to talk to him about the investigation. He said that defendant replied that he would be "glad to talk with me." Immediately thereafter he advised defendant of his constitutional rights as guaranteed by *Miranda*. He admitted that at the time he questioned defendant he had no probable cause to arrest him. He also admitted that he untruthfully told the defendant that his fingerprints were found at the scene of the crime. After Huggins told him this defendant gave Huggins a statement confessing to the crime.

Officer David Lienard of the Mount Olive Police Department testified that he picked up the defendant at the corner of Main and Poplar Streets at approximately 2:50 p.m. on August 31, 1976. This was done at the request of Huggins. After defendant got to the police station, defendant said he wanted to talk to his girl friend who was supposed to meet him at the place where he was picked up.

"Q: In fact, how far from where you first apprehended Mr. Boerckel had you walked with him so that he could converse with his girl friend?

A. I didn't walk with him from where I first apprehended him. I took him from where I first apprehended him to the police station and then from the police station I walked approximately one block on the south side of the street to the intersection of Main and Poplar there and that's when he conversed with his girl friend.

Q: All right, in other words how did you get from the point that you apprehended him to the police station?

A. I believe the squad car, sir.

Q. He was in the car?

A: Yes, sir.

Q: And you drove down to the police station?

A: Yes, sir.

Q: You went into the police station?

A: Yes, sir.

Q: And then he asked that he wanted to talk to his girl friend?

A: I contacted Detective Huggins—I believe I explained to him first of all.

Q: Okay, what did you do, what did you do once you got back to the police station?

A: Well, I explained to him that Detective Huggins wanted to talk to him."

The arrest report of this incident filed by Lienard reads in part as follows:

"On 8-31-76 Ptm Lienard of the Mt Olive Police Dept talked to Detective Larry Huggins of the Illinois State Police at District 11-A at 1:30 PM. Det. Huggins informed Ptm. Lienard that he was looking for a Darren Boerckel of Litchfield in Reference to the Rape of [M.D]. Patrolman Lienard advised that if he located Boerckel he would hold him and Contact Det. Huggins.

At 2:45 PM Ptm Lienard seen the Boerckel subject at the corner of Poplar and W Main and picked him up and returned to the Police Station. Ptm Lienard advised the Boerckel subject who identified himself as Darren E Boerckel of 345 S Grant, Litchfield, Ill, white, male, DOB 1/29/59. Ptm. Lienard informed him that Detective Huggins of the Illinois State Police wanted to talk to him in reference to an Investigation going on.

Darren Boerckel requested that Ptm Lienard go with him to the corner of Poplar & Main so he could tell his girl friend not to wait for him. Ptm Lienard complied with this request. Ptm Lienard called District 11-A at 2:55 PM and requested Detective Huggins at which time 11-A contacted him and advised Ptm Lienard he was on his way to Mt. Olive PD."

Defendant testified that he did not go with Lienard willingly and that he was searched at the station prior to the time that Huggins arrived. His testimony that he was searched was not rebutted.

In spite of the foregoing evidence, the majority holds that the defendant was not under arrest until after he incriminated himself. How the majority can square this holding with their decision in the recent case of *People v. Foster* (1978), 66 Ill. App. 3d 193, 383 N.E.2d 755, is difficult to see. In that case this court said:

"An arrest involves the authority to arrest, an assertion of that authority with *intention* to effect an arrest, and the restraint of the person to be arrested. [Citations.] All of these elements are present in the instant case notwithstanding the police officers' statements that respondent was not arrested and was free to leave. We first note that intent, being a state of mind, is rarely susceptible of direct proof, but must ordinarily be inferred from the facts. The officers' declarations of intent at the hearing are only one factor in

considering whether respondent was under arrest. In recognition that such declarations are often self-serving and conclusory, we feel compelled to scrutinize the acts of all the participants as well. The evidence shows that Officer Lively instructed the officers of the DuQuoin Police Department to bring respondent to the police station. This directive was mandatory, not discretionary. When Officer Jackson confronted respondent on Division Street, it was apparent that respondent had no choice but to comply with the request to get in the squad car. The fact that respondent offered no resistance does not lend support to the State's argument that there was no arrest. Respondent simply recognized that if he failed to comply with Jackson's demand he still would be taken to the station. Likewise, at the interrogation, respondent had reason to believe that it would be futile to attempt to leave. Although Officer Lively testified that respondent could have left, in light of the intensive interrogation in the courtroom in the presence of two police officers, respondent had no reasonable opportunity to go home until after the termination of the questioning. The State cannot now assert that respondent was free to go when it was apparent that he was being restrained."

In its opinion in this case the majority says:

"The medical evidence and spontaneous statements of the victim to the McCarts established the occurrence of both the rape and aggravated battery offenses. Defendant's confession was corroborated in all material respects by the spontaneous declarations of the victim, indicating that he was in fact the perpetrator of these crimes. In addition, defendant's identity as the offender was also bolstered by the fact that both the rapist and defendant had long hair, type O blood and were secretors. Defendant's confession was further corroborated by the fact that defendant knew the victim was wearing no undergarments at the time of the attack."

Did the perpetrator of this crime have long hair? The State took an evidentiary deposition from the victim in this case, part of which was read into evidence by the defense:

"Q: Now you say that you can't recall the characteristics of the individual, is that correct?
A: Yes.
Q: The individual may have had short hair?
A: I don't know.
Q: You just don't recall if it was short hair or long hair?
A: Short hair.
Q: Pardon.

A: If it is the same one I think he had short hair."

Whether the defendant said he knew the victim was wearing no undergarments at the time of the attack is open to question, since it was not included in the statement taken from him by Huggins.

The result reached by the majority in this case is also in direct conflict with *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, and *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.