THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID FAUNTLEROY *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 1—87—1152, 1—87—1973 cons.

Opinion filed September 30, 1991.—Modified on denial of rehearing February 3, 1992.

Michael J. Pelletier and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant David Fauntleroy.

Randolph N. Stone, Public Defender, and James Andrews, *pro se*, both of Chicago (James L. Rhodes, Assistant Public Defender, of counsel), for appellant James Andrews.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb and William P. Pistorius, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

In the early morning hours of March 30, 1983, Keith Lewis was found dead of gunshot wounds in a southside alley in Chicago. Following an investigation, codefendants David Fauntleroy and James Andrews were charged, *inter alia*, with murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1) and armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2). Their cases were severed and, after being found guilty by a jury as charged, the court gave each defendant a natural life sentence for murder and a concurrent 60-year term for armed robbery. The defendants have brought separate appeals, now consolidated, alleging various trial and sentencing errors, the details of which we later provide.

The evidence received against each defendant at their separate trials consisted primarily of their individual confessions and the testimony of occurrence witnesses and law enforcement personnel. This evidence may be summarized as follows.

In the evening of March 29, 1983, defendants discussed robbing someone while standing in front of a southside restaurant. Keith Lewis, whom Fauntleroy knew, came by the restaurant. Defendants approached Lewis, and Fauntleroy asked him for a ride to a location where the defendants could purchase some marijuana. As the defendants encountered Lewis, one of them[1] stuck a gun in Lewis' side and ordered him into the car. Andrews drove the car to an alley while Fauntleroy sat in back and Lewis sat in the passenger seat. At the alley, Lewis' wallet, neck chains and watch were taken. Fauntleroy told Andrews that Lewis knew him and would tell the police. Andrews knocked Lewis to the ground and shot him in the head three times. Neighbors heard the shots, but were unable to identify the defendants. Defendants then drove Lewis' car to another alley where they attempted to set a fire in the car's backseat. Defendants met later that evening and used the proceeds of the robbery to "get high." Lewis' neck chains were sold to Fauntleroy's sister.

The following morning, the neighbors discovered Lewis' body in the alley. An autopsy report showed the cause of death to be gunshot wounds to the head. Lewis' family identified the body and Lewis' abandoned, partially burnt car. Lewis' neck chains were later recovered by the police and identified in court by Lewis' sister as the neck chains her brother was wearing on the night of his murder.

We first address Fauntleroy's four contentions on appeal. Relying on *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, Fauntleroy first contends that the court denied him his sixth amendment right to confront an adverse witness.

The record with respect to this issue reflects that, prior to trial, Fauntleroy moved *in limine* to preclude police officers from repeating any statement Andrews may have made which implicated Fauntleroy. The State responded that this evidence was necessary to demonstrate the totality of the circumstances surrounding Fauntleroy's confession and, therefore, its reliability. The court ruled the State could elicit that Andrews made a statement implicating Fauntleroy and, when confronted with Andrews' statement, Fauntleroy then confessed.

During the State's case in chief, the jury learned that Andrews made a statement to the police which was then transcribed, reviewed by Andrews and then signed. Armed with this statement, the police asked Fauntleroy, who was then being held in a separate interview

---

[1]Andrews' confession claimed that Fauntleroy possessed the gun at this point, while Fauntleroy claimed that Andrews possessed the gun at this point.

room, if he was involved in the murder. When Fauntleroy denied any involvement, the police told him that he was lying. Chicago police detective McWeeny testified as follows as to what transpired next:

"Q. MR. DWYER [Assistant State's Attorney]: Now when you received a copy [of Andrews' confession] which was exactly the same as this statement, would you tell the ladies and gentlemen of the jury what if anything you did with this document?

A. Myself and Detective Madigan at that time then returned to the interview room. Both myself and Detective Madigan sat down in front of him. We placed a copy of that statement in front of Mr. Fauntleroy, whereupon then I engaged him in a conversation.

\* \* \*

Q. What happened at that time?

A. At that time, then David looked at the statement and I looked at him and I told him, I said, 'You don't think this is for real do you, this statement?' He looked at me and says 'No, I don't.' I says 'Well, watch this,' and I left the room and I walked across the hall.

\* \* \*

A. \*\*\* I brought James Andrews back to the room where Mr. Fauntleroy was at and he stood in the doorway and I said 'James, is that your statement?'

MR. KULL [Defense attorney]: Judge, I'm going to object to any further statements as to what Andrews says, if he says anything.

\* \* \*

THE COURT: I will overrule it.

Q. [Assistant State's Attorney]: What was said at this time?

A. James responded 'Yes it is, yes;' and he looked—him and David looked at each other and Andrews said to David—he says 'Tell the truth, I did.' I then took Andrews back to where he was being held in custody and I returned to the room. I walked into the room. At this point now I was standing up. I looked at him and I went like that to him. I said 'Hey, it's all true.' At that point he is like this and he is staring and he says 'Okay, okay.' He says 'I was there but I didn't shoot anybody.' "

Fauntleroy subsequently gave the written statement which was read to the jury at his trial.

Fauntleroy contends that while the details of Andrews' statement were not revealed to the jury, it was clearly brought home to them

that Andrews had implicated Fauntleroy. Fauntleroy asserts his sixth amendment right to confront an adverse witness was violated because he was denied the opportunity to cross-examine Andrews about his accusation that Fauntleroy was involved in the crime. To further support his contention, Fauntleroy directs this court to the State's rebuttal argument. Here, Fauntleroy asserts, the State directed the jury to rely on Andrews' statement as substantive evidence of Fauntleroy's guilt:

"The evidence on that point is not contradicted, unrebutted, about what happened. He walks in, he's got the statement and he puts it on the desk in front of him and he tells him what he's got. Madigan picks it up, you think we're kidding, take a look at it, look at the name on it. And then he takes it and he shows him his signature. It's signed. He still doesn't believe it, but now, he's not so confident. So what do they do? Immediately, they go get James Andrews and they bring him into the door and there they are, they're looking eyeball to eyeball. They know, each of them, in their heart, and they know that everybody else now knows. He looks at him and he says tell the truth, I did it. They take him out.

Then, McWeeny comes back in and now, you know, I've been confronted with the statement. The co-conspirator in the murder and robbery is right there, telling him to tell the truth. What does he do? When he walks in, Madigan goes, well, what does McWeeny have to do? It's all there. The statement, James Andrews is urging him to tell the truth, and the guilt, so what does he do, he does what the human being does. He thinks about it and he realizes they've got me, but what am I going to do about it. They got me dead bang."

■ We disagree with Fauntleroy's assertion that a confrontation violation occurred in this case. In *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, the Supreme Court held that a defendant's sixth amendment right to confront adverse witnesses is violated by introduction in a joint trial of a nontestifying accomplice's statement which implicates the defendant, even where limiting instructions are given to the jury. Here, no *Bruton* violation occurred because no part of Andrews' statement was brought before the jury. Neither in the direct testimony of any State witness nor in the State's closing argument did the jury hear the substance of Andrews' statement. Accordingly, because the substance of Andrews' statement was not revealed to the jury, *Bruton*, and the other cases upon which defendant relies, are distinguishable. (See *People v. Dun-*

*can* (1988), 124 Ill. 2d 400, 530 N.E.2d 423; *People v. Hernandez* (1987), 121 Ill. 2d 293, 521 N.E.2d 25, *cert. denied* (1988), 488 U.S. 869, 102 L. Ed. 2d 146, 109 S. Ct. 177; *People v. Tyner* (1964), 30 Ill. 2d 101, 195 N.E.2d 675; *People v. Clark* (1959), 17 Ill. 2d 486, 162 N.E.2d 413; *People v. Burns* (1988), 171 Ill. App. 3d 178, 524 N.E.2d 1164; *People v. Jones* (1988), 169 Ill. App. 3d 883, 524 N.E.2d 593; *People v. Lincoln* (1987), 157 Ill. App. 3d 700, 510 N.E.2d 1026; *People v. McVay* (1981), 98 Ill. App. 3d 708, 424 N.E.2d 922.) In all these cases, a *Bruton* violation occurred because the substance of a nontestifying codefendant's statement, which either directly or indirectly implicated the defendant, was used as substantive evidence against the defendant. Here, in contrast, as Detective McWeeny's testimony reveals, the circumstances surrounding Fauntleroy's confession gave nothing more to the jury than the inference that Andrews implicated Fauntleroy. Illinois cases have repeatedly held that where the substance of a codefendant's statement is not revealed, an officer may properly testify concerning investigatory procedures, even though the jury can reasonably infer therefrom that the accomplice implicated the defendant. See, *e.g., People v. Moman* (1990), 201 Ill. App. 3d 293, 303, 558 N.E.2d 1231, 1237 (and cases cited therein).

In rejecting defendant's contention, we recognize that Andrews' statement to Fauntleroy "to tell the truth" is the statement of a nontestifying codefendant which carries with it a strong inference of implication. We believe, however, that its admission was not error as it was offered for the nonhearsay purpose of showing the jury the circumstances surrounding Fauntleroy's confession and the effect Andrews' presence and his "truth" remark had on Fauntleroy. (See *People v. McNeal* (1987), 160 Ill. App. 3d 796, 800-01, 513 N.E.2d 897, 900-01 (officer's in-court repetition of extrajudicial identifications not error where they were offered for nonhearsay purpose).) The truth of whether Andrews had in fact told the "truth," as Andrews said he had, was immaterial. What was material is the impact this statement and Andrews' presence had upon Fauntleroy's state of mind just prior to his confession. This was the State's purpose in offering this entire line of testimony, as is made clear by the State's rebuttal argument. Accordingly, we reject defendant's contention that he was denied the right to confront an adverse witness.

Fauntleroy's second issue on appeal is whether he was denied a fair trial when two State witnesses testified that defendant's detention in this case began when he was arrested on an outstanding, unrelated arrest warrant. Prior to trial, defense counsel moved to preclude the State from eliciting testimony that Fauntleroy's detention in this

case was procured when he was arrested on an unrelated, outstanding warrant. The State argued that such evidence was needed to show the jury the complete circumstances surrounding Fauntleroy's arrest. The court ruled that the State could bring out the fact that Fauntleroy was arrested on a warrant, but not that the warrant was for an unrelated robbery. Defense still objected to this ruling, contending all that was necessary was for the State to bring out that defendant was arrested in connection with this case.

On appeal, defendant contends that the admission of the warrant evidence was error because it was irrelevant and suggested other crimes. Moreover, Fauntleroy notes that there were repeated attempts by the State, over defense objections, to elicit the specific underlying crime in disregard of the court's prior ruling. Fauntleroy contends that these attempts, coupled with the senior prosecutor's comment before the jury to the questioning prosecutor that this line of questioning was inappropriate, enhanced the jury's focus on the other crimes evidence.

The decision whether to admit other crimes evidence is within the sound discretion of the trial court. (*People v. Lieberman* (1982), 107 Ill. App. 3d 949, 955, 438 N.E.2d 516, 521.) The evidence is inadmissible to show that the defendant had a propensity to engage in criminal activity; however, it may be admitted when relevant for other purposes. (*People v. Baptist* (1979), 76 Ill. 2d 19, 27, 389 N.E.2d 1200, 1204.) Other crimes evidence has been held admissible if relevant to demonstrate knowledge, intent, motive, plan, or identification (*People v. Lindgren* (1980), 79 Ill. 2d 129, 137, 402 N.E.2d 238, 242; *People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489, 499), or if it is relevant to police investigation of the offense at issue. The investigatory procedures must involve an integral part of the narrative of the arrest. (*People v. Scott* (1982), 108 Ill. App. 3d 607, 613, 439 N.E.2d 130, 135.) Reference to another crime during such narrative is admissible if it explains the circumstances surrounding a defendant's arrest. *People v. Morthole* (1977), 51 Ill. App. 3d 919, 932, 366 N.E.2d 606, 615, *overruled on other grounds, People v. Lewis* (1979), 75 Ill. App. 3d 560, 393 N.E.2d 1380.

■ In this case, no error occurred when the jury was informed that defendant's detention in this case began with his arrest on an outstanding warrant. In *Morthole*, defendant was charged with possession of drugs discovered during a search incident to his arrest. The arresting officer testified that he searched defendant that day because of an outstanding arrest warrant on an unrelated drug delivery charge. Such testimony was determined to have been properly admit-

ted, although it suggested other criminal activity, because it was relevant to the circumstances of the arrest and it was part of a continuing narrative. *Morthole*, 51 Ill. App. 3d at 932, 366 N.E.2d at 615.

Similarly, in *People v. Robinson* (1968), 98 Ill. App. 2d 285, 240 N.E.2d 397, the arresting officer testified that he stopped defendant because he was driving a reportedly stolen car. The officer looked in the rear window of the car and noticed numerous articles of stolen clothing and personal property. Defendant was subsequently charged with burglary. The court ruled that it was permissible for the officer to explain the circumstances surrounding defendant's burglary arrest. *Robinson*, 98 Ill. App. 2d at 288-89, 240 N.E.2d at 398; see also *People v. Goka* (1983), 119 Ill. App. 3d 1024, 458 N.E.2d 26; *People v. Young* (1983), 118 Ill. App. 3d 803, 455 N.E.2d 845 (both holding evidence of arrest on outstanding warrant proper where nature of crime not disclosed).

In support of his contention on this issue, Fauntleroy misplaces his reliance on *People v. Spiezio* (1982), 105 Ill. App. 3d 769, 434 N.E.2d 837, *People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238, and *People v. Stover* (1982), 89 Ill. 2d 189, 432 N.E.2d 262. In *Spiezio* and *Lindgren*, the other crimes evidence related to crimes committed or discovered by the police *after* defendant had committed or was arrested for the crime charged. Consequently, the other crimes evidence could not have been offered to show the circumstances surrounding defendant's arrest for the crime with which he was charged. In *Stover*, the court held the admission of testimony showing the defendant's acquaintance with the arresting officer served only to show defendant's prior criminal activity. *Stover* is distinguishable on its facts.

In this case, the evidence relating to defendant's arrest on an outstanding warrant was part of narrative testimony regarding the circumstances surrounding defendant's arrest; the nature of the underlying crime for which the warrant issued was not disclosed to the jury. As our past cases show, this evidence was relevant to show the steps police took in their investigation, and the manner in which defendant's custody began. Relevant evidence need not be excluded merely because of its prejudice to defendant. (*Goka*, 119 Ill. App. 3d at 1030, 458 N.E.2d at 31.) Accordingly, we conclude that the circuit court did not abuse its discretion in allowing into evidence the fact that defendant was arrested on an outstanding warrant.

■ Error was similarly not committed when the State, according to defendant, repeatedly questioned Officer Pienta in an attempt to disclose the nature of the underlying crime. Our review of the record

demonstrates that the State was attempting to establish that Fauntleroy was made fully aware of the reason for his arrest, and not, as Fauntleroy asserts, the elicitation of testimony regarding the nature of the underlying crime for which he was arrested. Indeed, we note that many of counsel's questions were prefaced by language alerting the witness to not disclose the specific offense for which Fauntleroy was arrested. Moreover, to the extent the court believed that the State was attempting to violate its order and elicit the specific offense, defense counsel's objections were sustained. Because the prosecutor did not repeatedly attempt to ask an improper question in the face of an adverse ruling, defendant's cases which are predicated on such scenario are distinguishable. (See *People v. Hovanec* (1976), 40 Ill. App. 3d 15, 351 N.E.2d 402; see also *People v. Larry* (1991), 218 Ill. App. 3d 658.) Accordingly, we believe that the State's questions did not amount to error or, alternatively, if error occurred, any such error was insufficiently prejudicial to warrant reversal.

Finally, and in connection with the above alleged error, we do not believe error occurred when the prosecutor commented to his assistant "No, we can't ask that question." The record reflects that during a sidebar following the termination of Officer Pienta's questioning, defense counsel brought the above comment to the court's attention. The court admonished the prosecutor on the matter and he apologized, stating the comment was not made with the intent that the jury would hear it. Again, we conclude that the comment, even if heard by the jury, was neither error nor, if so, sufficiently prejudicial as to warrant reversal.

Fauntleroy's remaining issues on appeal relate to his sentence. Fauntleroy contends in particular that he deserves resentencing because (1) the trial court improperly considered, in arriving at his sentence, evidence of a murder for which he was acquitted, (2) the court improperly sentenced him and Andrews to the same sentence where the two were not similarly situated, and (3) the murder and armed robbery do not reflect exceptionally brutal or heinous behavior.

■ With respect to defendant's first sentencing error, the record reflects that defendants were both charged with the unrelated murder of Floyd Jenkins. After a jury trial, Fauntleroy was acquitted of that murder while Andrews was convicted. During Andrews' sentencing hearing, the court noted Fauntleroy's acquittal and stated, with respect to Andrews' sentence, that it served as a mitigating factor which would preclude the death penalty. The court then noted that, in its own belief, the two defendants were equally guilty of the Jenkins murder notwithstanding the jury's conclusion to the contrary. The

court also stated: "I don't think you are any less guilty than David Fauntleroy, so I am going to impose the same sentence. You are both guilty of the same two cold-blooded, execution type murder[s]." It is upon these statements Fauntleroy relies for his argument that the court improperly considered his acquittal when determining his sentence.

We reject defendant's argument that the court improperly considered his acquittal in the Jenkins case during his sentencing in this case. As the State notes, the judge's comments in Andrews' sentencing hearing must be read in their entirety. Fauntleroy's acquittal was used as a mitigating factor in sentencing Andrews. It was in this context the court stated that it considered Andrews' and Fauntleroy's guilt equal. Moreover, as noted by the State, the court, during Fauntleroy's sentencing hearing, stated what it would and would not consider in sentencing Fauntleroy:

"MR. DWYER [Assistant State's Attorney]: And, at this time, your Honor, we would ask leave of court to supplement that Pre-Sentence Investigation with two reports from the Cook County Department of Corrections which are disciplinary reports and finding of fact.

\* \* \*

Yes, your Honor. I believe at the sentencing hearing, the court is entitled to consider aspects of the defendant, including his conduct while in jail.

THE COURT: Well, I probably could. But I'm not going to. I'm not going to consider anything except the crime that was committed.

MR. DWYER: Well, your honor, we are asking leave to present witnesses at the hearing in aggravation regarding another crime committed.

THE COURT: I'm not going to hear it. But I'm not going to consider any other crime.

MR. DWYER: Okay.

If I understand correctly, then, the court will consider no other crimes that the defendant has committed.

THE COURT: Just the one that he was found guilty on.

MR. DWYER: Okay.

\* \* \*

THE COURT: Just so the record is clear: I heard all the evidence on the trial where they found him guilty. I'm considering all that evidence. I'm considering all the Pre-Sentence Report. And I'll hear matters in aggravation, mitigation."

Following this discourse, the court heard matters in aggravation, which were limited to the State's argument that defendant's sentence should be enhanced due to the exceptionally brutal and heinous nature of the crime.

As the above quote indicates, defendant's argument that the court considered his acquittal in the Jenkins case is incorrect. The court specifically limited what it would consider in sentencing Fauntleroy to the one crime for which defendant was found guilty. While the court used Fauntleroy's acquittal to ratchet downward Andrews' sentence, the above passage clearly shows that Fauntleroy's acquittal was not used to enhance his sentence. Accordingly, we reject defendant's argument as not supported by the record.

As for Fauntleroy's remaining arguments relative to his sentence, we believe the court did not abuse its discretion in concluding that (1) Fauntleroy's role in the crime was not so different from Andrews' as to require a lesser sentence, and (2) the killing and armed robbery qualified as exceptionally brutal and heinous.

Fauntleroy's natural-life and extended-term armed robbery sentences are predicated upon a judicial finding that the crime "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1983, ch. 38, pars. 1005—8—1(a)(1)(b), 1005—5—3.2(b)(2).) A defendant's sentence will not be set aside absent an abuse of discretion. *People v. Almo* (1985), 108 Ill. 2d 54, 483 N.E.2d 203.

■■ In this case, the court properly sentenced Fauntleroy. The court stated during Fauntleroy's sentencing: "This was a cold-blooded execution after the robbery, just to cover up the fact that they robbed this individual because this defendant knew Keith Lewis." The record supports the court's observation.

Lewis' murder was execution style, and defendant did nothing to stop it. Defendant asserts that he told Andrews not to kill Lewis, but this is an uncorroborated, self-serving statement, and is contradicted by defendant's post-murder conduct of using the proceeds of the robbery to "get high," and the failure to show any remorse for his acquaintance's murder. Also, the choice of Lewis as the victim was made by Fauntleroy due to his familiarity with Lewis. Fauntleroy used this familiarity as a means by which to approach Lewis for a ride. Fauntleroy's choice led to Lewis' subsequent murder. Although Fauntleroy did not pull the trigger, his role was nevertheless meaningful and not so different as to require a different sentence.

Finally, we believe that the circuit court acted within its discretion in finding that this murder was accompanied by exceptionally brutal

and heinous behavior indicative of wanton cruelty. In reviewing the imposition of Fauntleroy's natural life sentence, we have reviewed numerous supreme and appellate court opinions on the subject. This review leads us to conclude that, while the issue of whether this murder was exceptionally brutal and heinous is indeed a close question, we will not disturb the circuit court's decision to resolve that question to Fauntleroy's detriment, where evidence in the record and appellate authority supports its imposition.

In reviewing whether the instant murder qualifies as exceptionally brutal and heinous, we believe that one key fact places this murder within those classes of murders for which extended term sentences have been approved. The principal fact to which we refer is that this was an execution-style murder, with the victim being shot three times in the back of the head after being knocked to the ground. We believe the circuit court was more than entitled to hold that this type of murder qualified as exceptionally brutal and heinous behavior. To adopt Fauntleroy's argument and hold otherwise would amount to this court substituting its judgment for that of the circuit court rather than merely determining whether an abuse of discretion has been shown.

We acknowledge, as defendant would have us do, that he did not pull the trigger; that he may not have premeditated the killing; and that he has no prior history of violent crimes. These facts notwithstanding, defendant's role in this murder was nonetheless meaningful: the victim knew Fauntleroy; Fauntleroy chose the victim based on this knowledge; and Fauntleroy's acquaintance with the victim motivated the killing. We also note that the killing occurred *after* the completion of the armed robbery and that the victim offered no resistance whatsoever to the crimes committed against him. The circuit court was entitled to take these facts into consideration in sentencing Fauntleroy. Moreover, this court has consistently held that the application of the extended-term statute is determined by the offense, not by the extent or nature of the offender's participation therein; the fact that a defendant is convicted under a theory of accountability or that his participation in the crime was less than that of his co-offenders does not preclude the imposition of an extended sentence upon him. *People v. Clay* (1984), 124 Ill. App. 3d 140, 154, 463 N.E.2d 929, 940, citing *People v. Rogers* (1984), 122 Ill. App. 3d 384, 461 N.E.2d 511; *People v. Rowe* (1983), 115 Ill. App. 3d 322, 450 N.E.2d 804; *People v. Tibbs* (1981), 103 Ill. App. 3d 73, 430 N.E.2d 681; *People v. Gray* (1980), 87 Ill. App. 3d 142, 408 N.E.2d 1150.

Although not cited by the parties, we refer to *People v. Moritz* (1988), 173 Ill. App. 3d 498, 527 N.E.2d 1102, *People v. Burke* (1987),

164 Ill. App. 3d 889, 518 N.E.2d 372, *People v. Johnson* (1987), 159 Ill. App. 3d 991, 513 N.E.2d 852, and *People v. Reese* (1984), 121 Ill. App. 3d 977, 460 N.E.2d 446, to support our affirmance of defendant's sentence. In *Johnson, Moritz* and *Reese*, extended-term sentences were approved under similar circumstances to the case at bar, namely, execution-style murders or attempted murders that were committed or attempted in association with the taking of another's property. In *Burke*, an extended-term sentence was imposed notwithstanding the fact that defendant did not pull the trigger and otherwise had a significantly lesser degree of culpability than his murderous codefendant.

As indicated, we find unpersuasive Fauntleroy's citation to various authority. Neither *People v. Andrews* (1989), 132 Ill. 2d 451, 548 N.E.2d 1025, nor *People v. Verser* (1990), 200 Ill. App. 3d 613, 558 N.E.2d 226, is persuasive since neither of those cases involves a cold-blooded, execution-style murder as is present in this case. The other cases defendant cites, which are too numerous to recite here, uphold extended-term sentences. While the murders in those cases may be viewed as more exceptionally brutal or heinous than the instant case, they do not require that we reverse defendant's sentence. To the contrary, the gruesome nature of many of those crimes supports our belief that the execution-style murder involved here properly belongs in the same class as those crimes.

For the foregoing reasons, we affirm Fauntleroy's conviction and length of sentence.

We now focus on Andrews' contentions on appeal. Andrews raises seven issues on appeal, the first of which is whether he was denied a fair trial when the prosecution used six of its seven peremptory challenges to exclude black jurors.

■ During and after jury selection, defense counsel moved to require the State to disclose its reasons for striking six black jurors. Without making any finding as to whether defendant had established a *prima facie* case under *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, the trial court required the State to explain the purpose of its strikes. After hearing the State's proffered reasons and the respective argument of counsel, the court denied defendant's motion to dismiss the jury.

We begin our *Batson* analysis by analyzing the *Batson* opinion itself. We note that *Batson* is the first of a recent trilogy of Supreme Court opinions which address the subject matter of jurors improperly being stricken because of their race. (See also *Powers v. Ohio* (1991), 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364; *Hernandez v. New*

*York* (1991), 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859.) Because these other opinions bear on the issue at hand, our analysis ultimately includes a discussion of these opinions as well.

In *Batson*, the Court stated that the equal protection clause forbids a prosecutor from peremptorily challenging potential jurors solely on account of their race. (*Batson*, 476 U.S. at 89, 90 L. Ed. 2d at 82-83, 106 S. Ct. at 1719.) To establish a *prima facie* case of purposeful discrimination in the context of selecting a petit jury, *Batson* set forth the following requirements: First, defendant must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of defendant's race. Second, defendant is entitled to rely on the fact that peremptory challenges constitute a jury selection practice that permits " 'those to discriminate who are of a mind to discriminate.' " (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723, quoting *Avery v. Georgia* (1953), 345 U.S. 559, 97 L. Ed. 1244, 73 S. Ct. 891.) Finally, defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used his peremptory challenges to exclude jurors on account of their race. (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723.) This combination of factors in the impaneling of a petit jury raises the necessary inference of purposeful discrimination. *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.

As examples of "relevant circumstances" which a trial court may consider, the Court cited to the existence or nonexistence of a "pattern" of strikes against black jurors as possibly giving rise to an inference of discriminatory purpose. (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) Additionally, the Court cited to the prosecutor's questions and statements during the *voir dire* examination and in exercising his challenges as possibly supporting or refuting an inference of discriminatory purpose. (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) The Court expressed confidence that experienced trial judges will be able to decide "if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723; *cf. People v. Mahaffey* (1989), 128 Ill. 2d 388, 413, 539 N.E.2d 1172, 1184, *cert. denied* (1989), 493 U.S. 873, 107 L. Ed. 2d 156, 110 S. Ct. 203 (a trial court's determination on the existence of a *prima facie* case will not be disturbed on review unless it is against the manifest weight of the evidence).

*Batson* stated that once a defendant has made a *prima facie* showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) While the prosecutor's proffered reason need not rise to the level justifying exercise of a challenge for cause (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723), the prosecutor must nevertheless give a "clear and reasonably specific" explanation which is neutral and related to the particular case to be tried. (*Batson*, 476 U.S. at 98 n.20, 90 L. Ed. 2d at 88 n.20, 106 S. Ct. at 1724 n.20.) It is insufficient to rebut a *prima facie* case for the prosecutor to merely deny a discriminatory motive or to affirm his good faith in making individual selections. *Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723-24.

As the final step in a discrimination analysis, *Batson* stated that the trial court then has "the duty to determine if the defendant has established purposeful discrimination." (*Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1724.) "Since the trial judge's findings [on the issue of intentional discrimination] largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21.

Subsequent to *Batson*, the Court decided *Powers v. Ohio* (1991), 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364. In *Powers*, the court modified the showing a defendant must make in establishing a *prima facie* case. In light of *Powers*, a defendant need no longer show that he is a member of "a cognizable racial group"; all defendants, regardless of race, are entitled to the protections of *Batson*. (*People v. Edwards* (1991), 144 Ill. 2d 108, 152, 579 N.E.2d 336, 353.) Accordingly, to establish a *prima facie* case in light of *Powers*, a defendant must demonstrate the "relevant circumstances" that raise an inference that the prosecutor peremptorily challenged venire members on account of their race. *Edwards*, 144 Ill. 2d at 153, 579 N.E.2d at 353-54.

On many occasions, this State's supreme court has listed the "relevant circumstances" which may be considered in determining whether an inference of discriminatory intent arises. These include: (1) a pattern of strikes against black jurors; (2) the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges; (3) the disproportionate use of peremptory challenges against blacks; (4) the level of black representation in the venire compared to the jury; (5) whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic; (6) and

the race of the defendant, the victim and the witnesses. (*Edwards*, 144 Ill. 2d at 153, 579 N.E.2d at 336, 354, citing *People v. Evans* (1988), 125 Ill. 2d 50, 530 N.E.2d 1360.) In light of *Powers*, an additional factor would be whether the stricken juror and defendant share the same race. *Cf. Powers*, 499 U.S. at 416, 113 L. Ed. 2d at 429, 111 S. Ct. at 1373-74; *People v. Kindelan* (1991), 213 Ill. App. 3d 548, 552, 572 N.E.2d 1138, 1140.

The final Supreme Court case in the *Batson* trilogy is *Hernandez v. New York* (1991), 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859. In *Hernandez*, the Court reviewed a prosecutor's proffered reason for striking a prospective Latino juror to determine whether the reason was race neutral and, if so, whether the State court's decision to accept the prosecutor's explanation should be sustained. (*Hernandez* (1991), 500 U.S. at 355, 114 L. Ed. 2d at 403, 111 S. Ct. at 1864.) *Hernandez* is particularly relevant to Andrews' *Batson* claim because *Hernandez* addressed how a reviewing court is to treat a *Batson* issue under circumstances where, as here, the trial court has collapsed *Batson*'s three-step analytical framework.

In *Hernandez*, the prosecutor had offered his reasons for rejecting the prospective jurors in question prior to the trial court ruling on whether a *prima facie* case existed. In analyzing how this collapsing is to be treated on review, the Court stated: "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." (*Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866; see also *People v. Boston* (1991), 224 Ill. App. 3d 218; *People v. Finley* (1991), 222 Ill. App. 3d 571; *People v. Walls* (1991), 220 Ill. App. 3d 564; *People v. Johnson* (1991), 218 Ill. App. 3d 967, 578 N.E.2d 1274 (all applying *Hernandez* where circuit court collapsed *Batson* analysis).) Because a collapsing of the *Batson* analytical framework renders moot the *prima facie* or first step of the *Batson* analysis, a reviewing court need only focus on the second and third steps of *Batson*. Again, we turn to *Hernandez* as it is worthy of a closer analysis regarding these latter two steps.

"In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." (*Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405-06, 111 S. Ct. at 1866.) "A neutral explanation *** means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of

the prosecutor's explanation. *Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."* (Emphasis added.) *Hernandez,* 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866.

Once the prosecutor offers a race-neutral basis for his exercise of peremptory challenges, the trial court has the duty to determine if the defendant has established purposeful discrimination. (*Hernandez,* 500 U.S. at 363, 114 L. Ed. 2d at 408, 111 S. Ct. at 1868; see also *People v. Harris* (1989), 129 Ill. 2d 123, 177, 544 N.E.2d 357, 381, *cert. denied* (1990), 494 U.S. 1018, 108 L. Ed. 2d 498, 110 S. Ct. 1323, quoting *Batson,* 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 ("trial court has the duty to weigh the evidence and 'determine if the defendant has established purposeful discrimination' ").) Disproportionate impact of a given exclusion criterion is one factor, among others, which the trial judge must assess in determining whether the prosecutor intended to discriminate. (*Hernandez,* 500 U.S. at 363, 114 L. Ed. 2d at 408, 111 S. Ct. at 1868; *People v. Johnson* (1991), 218 Ill. App. 3d 967, 980-81, 578 N.E.2d 1274, 1284.) The trial judge's determination on the question of intent represents a finding of fact accorded great deference on review (*Hernandez,* 500 U.S. at 364, 114 L. Ed. 2d at 408-09, 111 S. Ct. at 1868-69), which will not be disturbed on review unless it is clearly erroneous (*Hernandez,* 500 U.S. at 369, 114 L. Ed. 2d at 412, 111 S. Ct. at 1871). That is, the evidence must be such that a reviewing court on the entire evidence would be left with the definite and firm conviction that a mistake has been committed. *Hernandez,* 500 U.S. at 370, 114 L. Ed. 2d at 412-13, 111 S. Ct. at 1871.

In this case, as *Hernandez* dictates, our review of Andrews' *Batson* claim begins with an assessment of the prosecution's reasons for striking the six jurors in question to determine if such reasons are race neutral. We reiterate *Hernandez*'s specific language on this issue: "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez,* 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866.

The excluded jurors in this case were the following individuals: Dena Wright, Pertie Parish, Ronald Cross, Holly Williams, Beatrice Williams, and Estella Motry. As more fully explained below, we believe that no discriminatory intent is inherent in the State's explanations for striking these jurors and, accordingly, we deem the proffered reasons to be race neutral. We further believe that, on review of the evidence in total, the circuit court's ultimate finding on discriminatory intent was not clearly erroneous.

Regarding Dena Wright, Holly Williams and Beatrice Williams, the State's reasons reflect that all were excluded on account of their conduct during *voir dire*. The prosecution stated that he observed Dena Wright, during the questioning of other jurors, attempting to make eye contact with the defendant for "whatever purpose." As for Holly Williams, the prosecutor stated that, as he returned from the bench, Williams looked at him and rolled her eyes. The prosecutor believed that Williams showed impatience for something that was going on in court. Defense counsel stated for the record that he did not observe Williams roll her eyes as claimed. Beatrice Williams was excluded because the prosecutor questioned her accuracy when she stated during *voir dire* that she had been called as a juror in a divorce case but did not serve.

Discriminatory intent is not inherent in the State's explanations for striking Wright, Holly Williams or Beatrice Williams as the strikes of these jurors were based on their outward demeanor. Courts, on numerous occasions, have found that the conduct or demeanor of a prospective juror is a valid, race-neutral reason for striking that juror. *Hernandez*, 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (conduct of juror led prosecutor to believe that juror would ignore official translation of testimony); *People v. Harris* (1989), 129 Ill. 2d 123, 175-76, 544 N.E.2d 357, 380 (juror was "meek and sleepy," did not answer questions in a forthright manner, and prosecutor was uncomfortable with her demeanor); *People v. Young* (1989), 128 Ill. 2d 1, 20, 538 N.E.2d 453, 457 ("The demeanor of a prospective juror has traditionally been a factor of importance in jury selection"); *People v. Finley* (1991), 222 Ill. App. 3d 571, 582-83 (jurors' inaudibility and staring at prosecutor); *People v. Johnson* (1991), 218 Ill. App. 3d 967, 986, 578 N.E.2d 1274, 1287-88 (juror was inattentive, disinterested and appeared to sleep during questioning of other jurors); *People v. Talley* (1987), 152 Ill. App. 3d 971, 987, 504 N.E.2d 1318, 1327 (juror's demeanor and response to questions); *People v. Taylor* (1988), 171 Ill. App. 3d 261, 267, 524 N.E.2d 1216, 1220 (juror had forceful demeanor and appeared hostile to State); but see *People v. Walls* (1991), 220 Ill. App. 3d 564, 575 ("Nor should the fact that [the prospective juror] looked at the defendants *** disqualify [her] from serving on the jury.").

We believe defendant's objections to the prosecutor's exclusion of the other three jurors also fail along the lines of our analysis of Wright and the two Williamses. The reasons proffered for these excluded jurors were not inherently discriminatory and were valid, race-

neutral explanations. We briefly address each of the jurors and the State's offered reasons.

Ronald Cross was excluded because he failed to disclose the fact that he spent 30 days in custody 25 years ago for a Los Angeles conviction. The prosecutor believed this to be concealment. We believe concealment is a race-neutral explanation which perhaps even rises to the level of striking Cross for cause. See *Hernandez*, 500 U.S. at 362-63, 114 L. Ed. 2d at 407-08, 111 S. Ct. at 1869 ("While the reason offered by the prosecutor for a peremptory strike need not rise to the level of a challenge for cause [citation], the fact that it corresponds to a valid for-cause challenge will demonstrate its race-neutral character").

Pertie Parish was excluded because of an absence of family contact. Parish was single and lived in an area consisting predominantly of apartment complexes. The prosecutor articulated that in this murder case, the victim was murdered while he was on his way home from dropping his mother off at work. The State contended that Parish may not be able to understand the family relationships involved here. We believe the proffered reason complies with *Batson* and *Hernandez*; the reason was reasonably specific and tied to the facts of this case.

Estella Motry was excluded because she formerly lived with her mother in Markham. The prosecutor stated that during trial, Motry may come to learn that defense witnesses are neighbors or live in close proximity to her family and that this proximity may influence her adversely against the State. Again, we believe there is nothing inherently discriminatory about striking a juror because of the location of his or her residence. See *People v. Johnson* (1991), 218 Ill. App. 3d 967, 578 N.E.2d 1274 (reviewing exhaustively the validity of striking a juror because of the location of his residence).

Having determined that the proffered reasons by the State were race neutral, we review whether Andrews has proved purposeful discrimination. As the circuit court denied defendant's *Batson* motion, it implicitly found that no intentional discrimination occurred. We hold that this finding was not clearly erroneous.

Regarding the strikes based on demeanor, we recognize, as our supreme court has, "that explanations which focus upon a venireperson's body language or demeanor must be closely scrutinized because they are subjective and can be easily used by a prosecutor as a pretext for excluding persons on the basis of race." (*People v. Harris* (1989), 129 Ill. 2d 123, 176, 544 N.E.2d 357, 380.) We must also recognize, however, that the trial judge is in a better position to observe

the jurors' demeanor during *voir dire* and to evaluate the prosecutor's explanations for exercising a peremptory challenge. (*People v. Young* (1989), 128 Ill. 2d 1, 21, 538 N.E.2d 453, 457.) As *Hernandez* explained:

> "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' " (*Hernandez*, 500 U.S. at 365, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869, quoting *Wainwright v. Witt* (1985), 469 U.S. 412, 428, 83 L. Ed. 2d 841, 854, 105 S. Ct. 844, 859.)

The trial judge here found that the prosecution's concern over the demeanor of Wright and the two Williamses was an honest one. On review, we will not substitute our judgment for that of the circuit court and hold that the prosecutor's reasons were merely pretextual.

As for the other strikes, the same proposition applies. Whether the prosecutor's asserted reasons were pretextual was for the circuit court to decide in the first instance. We note that many of the State's strikes in this case occurred in between the State accepting tendered black jurors. This is an important fact, which demonstrates that the prosecutor was not bent on systematically excluding blacks from the jury. Moreover, when called upon to assert explanations for his strikes, the prosecutor was forthright with his reasons. (*Cf. Hernandez*, 500 U.S. at 369, 114 L. Ed. 2d at 412, 111 S. Ct. at 1872 ("the court could have relied on the fact[ ] that the prosecutor defended his use of peremptory challenges without being asked to do so by the judge").) Finally, we note that the circuit court could have noted that Andrews was tried before a jury consisting of six white and six black jurors, with one alternate being white and the other black. Finally, this was not an interracial crime, and the majority of witnesses were apparently black. For these reasons, it was not clearly erroneous for the circuit court to deny defendant's *Batson* motion.

Andrews' second contention on appeal is that he was denied a fair trial because the State failed to disclose a rebuttal witness prior to trial. Prior to trial, defendant's answer to the State's discovery motion included as an alibi defense the fact that, on the evening of Lewis' murder, defendant was at his sister's house visiting until the following morning. At trial, defendant's nephew and sister both testi-

fied that Andrews was with them watching television all night and that they remembered this fact because they had gotten a new television and cable that day. After the defense rested, the State sought leave to amend its discovery answer to include as a witness Rocky Marsh, an assistant manager of Multimedia Cable Division. The State discovered Marsh after conducting a brief investigation into the alibi witnesses' testimony regarding cable. The court permitted Marsh to testify over Andrews' objection, but only after defendant had an opportunity to interview Marsh. Marsh testified that cable was only ordered, not installed, on March 29, 1983; installation did not occur until April.

The rules of discovery require the State to disclose the names of those persons whom it intends to call as rebuttal witnesses together with a specific statement as to the substance of the testimony such witnesses will give at trial. (107 Ill. 2d R. 412(a).) However, until the State forms an intent to call the witness, disclosure is not required. (*People v. Jackson* (1990), 198 Ill. App. 3d 831, 556 N.E.2d 619, *cert. denied* (1991), 501 U.S. 1233, 115 L. Ed. 2d 1025, 111 S. Ct. 2858; *People v. Fox* (1988), 177 Ill. App. 3d 602, 532 N.E.2d 472; *People v. Pitts* (1982), 104 Ill. App. 3d 451, 432 N.E.2d 1062; *People v. Galindo* (1981), 95 Ill. App. 3d 927, 420 N.E.2d 773.) The reason for this rule is that a prosecutor cannot know if a witness will be called in rebuttal until the defense testimony is heard. (*Galindo*, 95 Ill. App. 3d at 932, 420 N.E.2d at 777.) Even where there has not been strict compliance with the rule, the exclusion of the rebuttal evidence is within the sound discretion of the trial court, the exercise of which will not be reviewed absent a showing of prejudice. *Jackson*, 198 Ill. App. 3d at 848, 556 N.E.2d at 630; *Pitts*, 104 Ill. App. 3d at 457, 432 N.E.2d at 1067-68; *Galindo*, 95 Ill. App. 3d at 932, 420 N.E.2d at 777.

■ In this case, the State did not formulate an intention to call Rocky Marsh until its investigation revealed that cable was not installed on the day of Lewis' murder as the alibi witnesses claimed. Accordingly, it was proper for the court to allow Marsh to testify despite the State's failure to include Marsh in its initial discovery response. (*Jackson*, 198 Ill. App. 3d 831, 556 N.E.2d 619; *Fox*, 177 Ill. App. 3d 602, 532 N.E.2d 472.) As for the prejudice to defendant, we believe it was self-inflicted. Defendant's failure to have his witnesses testify more clearly as to why they specifically remembered the day of Lewis' murder could only have resulted from a lack of complete investigation. Had a proper investigation been completed, the fact that cable was only ordered, not installed, on the day of Lewis' murder

would have become known. For these reasons, we reject defendant's contention.

Andrews' third contention on appeal relates to whether the court erred in denying his pretrial motion to suppress statements to the police on the ground that the statements were the result of physical and mental coercion.

On a motion to suppress a confession on the grounds it was involuntarily given, the State bears the burden of establishing by a preponderance of the evidence that the confessions were voluntary. (*People v. Caballero* (1983), 102 Ill. 2d 23, 464 N.E.2d 223, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362.) In determining whether a confession has been voluntarily given, courts have utilized the tests of whether, considering the totality of the circumstances, the confession is found to have been made freely and voluntarily and without compulsion (*People v. Prude* (1977), 66 Ill. 2d 470, 363 N.E.2d 371, *cert. denied* (1977), 434 U.S. 930, 54 L. Ed. 2d 291, 98 S. Ct. 418), or whether the defendant's will was overborne at the time he confessed so as not to be the product of rational intellect and free will (*Townsend v. Sain* (1963), 372 U.S. 293, 9 L. Ed. 2d 770, 83 S. Ct. 745; *People v. O'Leary* (1970), 45 Ill. 2d 122, 257 N.E.2d 112). In assessing the evidence, it is the duty of the trial court to resolve conflicts of evidence and determine the credibility of witnesses; the court's ultimate conclusion on the issue of voluntariness will not be disturbed unless it is against the manifest weight of the evidence. *People v. Clements* (1985), 135 Ill. App. 3d 1001, 482 N.E.2d 675, *cert. denied* (1986), 476 U.S. 1106, 90 L. Ed. 2d 361, 106 S. Ct. 1952.

■ In this case, after carefully reviewing the record under our limited role of review, we cannot conclude that the trial court's ruling that Andrews' confession was voluntary is against the manifest weight of the evidence. We recognize, as with most motions of this nature, that the evidence conflicted. Defendant's evidence showed that, after voluntarily accompanying the police to the station, defendant was handcuffed to a ring on the wall and then, over a period of seven hours, physically and mentally coerced into giving the court-reported confession used against him at trial. The State's evidence, on the other hand, as reflected in Andrews' court-reported statement, indicates that defendant was not mistreated and received his *Miranda* rights before confessing. Under our limited role of review, we cannot say that the court erred in finding defendant's confession voluntary.

Andrews' fourth contention is that he was denied effective assistance of counsel when his counsel failed to (1) investigate adequately his alibi defense regarding the installation of cable, and (2) move to

suppress his incriminating statements as the fruit of an illegal arrest. We reject both arguments.

In reviewing an ineffective assistance of counsel claim, we are mindful that our review is governed by *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and Illinois' adoption of *Strickland* in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061. These cases recognize that to succeed on such a claim, a defendant must establish that (1) counsel's performance was seriously deficient, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) In evaluating the performance factor, a defendant must also overcome the strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance and that the challenged conduct might have been nothing more than part of counsel's sound trial strategy. (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065-66.) In the end, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064.

We elect to reject defendant's *Strickland* claim under the second part of *Strickland*'s two-part test. As *Strickland* indicated, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

■ Regarding defendant's alibi defense, assuming counsel's assistance was ineffective, little prejudice resulted to defendant. Defendant's alibi witnesses were not completely impeached by the State's rebuttal witness. The alibi witnesses remembered the day of Lewis' murder because they were watching their new television and believed they were watching their newly installed cable. As the rebuttal witness testified, however, cable was only ordered that day, not installed. While this testimony lessens the credibility of the alibi witnesses, as it shows a faulty memory, it does not paint them as liars as defendant would have us believe. We cannot say that counsel's ineffectiveness so undermined the proceedings that a just result was not produced.

■■■ Regarding counsel's failure to move to suppress defendant's confession on the ground it was the fruit of an illegal arrest, the record reflects that, while defense counsel moved to suppress Andrews' statements on the ground that they were involuntary, counsel did not move to suppress the statements on the ground that they were the product of an illegal arrest. We have reviewed the record relative to the pretrial motion counsel did make, and conclude that defendant was not held against his will.

The record shows that on April 26, 1983, around 10 a.m., Chicago police detectives Madigan and McWeeny went to defendant's house and spoke with defendant's mother. When the detectives learned defendant was not home, they left a business card. Later, around noon that day, Chicago police officer Mokry received a radio assignment by which he was informed that defendant had called for Madigan and McWeeny. Mokry and his partner went to defendant's residence, and defendant agreed to accompany the police to the station. At the station, defendant was placed in an interview room until Madigan and McWeeny arrived. While testimony differed as to how long defendant waited, defendant and Officer Mokry testified about one-half hour passed. While defendant waited, defendant agreed to submit to fingerprinting.

Defendant predicates his *Strickland* issue on the illegal seizure which allegedly occurred between his arrival at the station and the time when Madigan and McWeeny arrived. As we review the record, defendant voluntarily accompanied the police to the station where he waited for the arrival of Madigan and McWeeny. Defendant testified he used the business card to call, and then agreed to accompany Mokry to the station. At the station, he waited for Madigan and McWeeny to arrive. Meanwhile, he consented to fingerprinting. Based on the record, we cannot conclude that defendant was seized against his will. Accordingly, defendant's claim of ineffective assistance of counsel must fail.

■■■ Andrews' fifth contention relates to the permissibility of sentencing him to a 60-year extended term for armed robbery in light of his natural life sentence for murder. As the State indicates, our supreme court found such a combination of sentences proper in *People v. Young* (1988), 124 Ill. 2d 147, 529 N.E.2d 497. We believe *Young* is dispositive of the issue and, therefore, affirm Andrews' sentence.

■■■ Andrews' remaining contentions were raised in his *pro se* supplemental brief. Andrews contends that his natural life sentence, which was predicated on section 5—8—1(a)(1)(c) (Ill. Rev. Stat.

1981, ch. 38, par. 1005—8—1(a)(1)(c) (allowing natural life sentence where defendant has been convicted previously for murder)), violates various constitutional guarantees in that defendants are automatically given a natural life sentence for their second murder notwithstanding the possibility that defendants may have had differing degrees of culpability when committing their murders.

In *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059, and *People v. Rodriguez* (1985), 134 Ill. App. 3d 582, 480 N.E.2d 1147, *cert. denied* (1986), 475 U.S. 1089, 89 L. Ed. 2d 731, 106 S. Ct. 1476, similar constitutional claims were rejected. In *Taylor*, the court held that the mandatory natural life sentencing provisions violated neither the separation of powers doctrine, nor the objective of restoring offenders to useful citizenship. In *Rodriguez*, the court rejected alleged due process and cruel and unusual punishment violations. We see Andrews' claim in this case as being no different from the ones rejected in *Taylor* and *Rodriguez*. (See also *People v. McNeal* (1987), 160 Ill. App. 3d 796, 513 N.E.2d 897.) Accordingly, we find Andrews' natural life sentence proper.

■ Defendant finally contends that certain prosecutorial comments denied him a fair trial. We have reviewed the comments, and conclude that the comments were not such a material factor in defendant's conviction that the jury would have likely reached a contrary verdict had they not been made. *People v. Mitchell* (1984), 123 Ill. App. 3d 868, 463 N.E.2d 864.

For the foregoing reasons, the convictions and sentence of the circuit court of Cook County are affirmed.

Affirmed.

O'CONNOR and MANNING, JJ., concur.